Page 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

\* \* \*

| | |
|---|---|
| GERARD JACKSON, individually and on behalf of all others similarly situated, | ) ) Civil File No. ) 4:22-cv-1466 |
| Plaintiff, | ) ) Remote Videoconference ) Deposition of: |
| vs. | ) ) NEAL CHIPPING |
| CLEAR LINK INSURANCE AGENCY, LLC, DIGITAL MEDIA SOLUTIONS, LLC, and EMPIRE SOLUTIONS, | ) ) ) |
| Defendant. | ) ) |
| _____ | ) |

\* \* \*

August 8, 2023
10:51 a.m.
Remote Web-based Videoconference
All parties appearing remotely

\* \* \*

Karina Palmer, CCR #951
- Registered Professional Reporter -
- Certified Realtime Reporter -



Page 2

```
 1   APPEARANCES:
 2
     For the Plaintiff:      Anthony I. Paronich, Pro Hac Vice
 3                           PARONICH LAW, P.C.
                             350 Lincoln Street
 4                           Suite 2400
                             Hingham, MA  02043
 5                           617-738-7080
                             anthony@paronichlaw.com
 6
     For the Defendant       Kennedy Nate, Esq.
 7   Clearlink:              RAY QUINNEY & NEBEKER
                             36 South State Street
 8                           Suite 1400
                             Salt Lake City, UT  84145
 9                           801-323-3354
                             knate@rqn.com
10
     For the Defendant       Neil Asnen, Esq.
11   Digital Media           Wallis Granat, Esq.
     Solutions:              KLEIN MOYNIHAN TURCO
12                           450 Seventh Avenue
                             40th Floor
13                           New York, NY  10123
                             212-246-0900
14                           nasnen@kleinmoynihan.com
15   Also Present:           Jeremy Hansen, Esq.,
                             Clear Link in-house counsel
16
17
18
19
20
21
22
23
24
25
```



Page 3

1                    INDEX OF EXAMINATION

2    NEAL CHIPPING:                                    PAGE

3    Examination By Mr. Paronich                          4

4    Examination By Mr. Asnen                            69

5

6                    INDEX OF EXHIBITS

7    EXHIBITS        DESCRIPTION                        PAGE

8    Exhibit 1       Bates stamp 8713                    52

9    Exhibit 2       Bates stamp 8739                    55

10   Exhibit 3       Bates stamp 8820                    56

11   Exhibit 4       Bates stamp 10318                   60

12   Exhibit 5       Bates stamp 11298                   61

13   Exhibit 6       Bates stamp 13214                   64

14   Exhibit 7       Bates stamp 13286                   65

15   Exhibit 8       Bates stamp 13594                   67

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1              P R O C E E D I N G S
 2
 3                   NEAL CHIPPING,
 4   having been administered an oath, was examined and
 5   testified as follows:
 6
 7                   EXAMINATION
 8   BY MR. PARONICH:
 9       Q.    Mr. Chipping, my name's Anthony Paronich;
10   I'm one of the attorneys for the plaintiff in this
11   action.
12             Have you ever had your deposition taken
13   before?
14       A.    No.
15       Q.    Okay.  So I'll go over some of the ground
16   rules that'll help us get through this, kind of, as
17   efficiently as possible.
18             So I'm gonna ask a series of questions
19   today, and your responsibility, based on the oath you
20   just took, is to try to answer as truthfully as you
21   can.  The oath you took today is similar to one that
22   you would take in a court of law.  Do you understand
23   that?
24       A.    Yes.
25       Q.    So whenever I'm explaining how a
```



Page 5

```
 1   deposition works, I always like to explain that what
 2   the court reporter is doing today is creating
 3   something that will read like a book, because I
 4   help -- I think that helps contextualize some of the
 5   rules.
 6             For example, you know, in -- in normal
 7   conversation, I'll always nod or shake my head
 8   because, who doesn't?  But if you're thinking about
 9   creating a book, that's kind of hard for the court
10   reporter to take down, so we just ask that you try
11   your best to give audible "yes" or "no" answers when
12   appropriate.  Does that make sense?
13        A.   Yes.
14        Q.   Okay.  Great.  The -- similarly, you know,
15   in typical human conversation, it's no big deal to
16   interrupt each other or potentially speak over one
17   another, especially if you know what the other
18   person's asking.  But here that actually just keeps
19   us longer because we have to get a clear record of
20   each answer and response.  Does that instruction also
21   make sense?
22        A.   Yes.
23        Q.   Your attorney may object from time to
24   time.  One of the few ways that this is different
25   than a traditional court of law or maybe something
```



Page 6

1   you seen on TV is that there's no judge here to
2   resolve our objections.  So objections are a pretty
3   standard part of the process, and even if an attorney
4   objects, unless they instruct you otherwise, and you
5   understand the question, you are still able to
6   answer.  Does that also make sense?
7        A.    Yes.
8        Q.    Okay.  And just two more quick
9   instructions.  The first is, even if it may feel like
10  it's responsive to a question I'm asking, any
11  conversations you've had with Mr. Nate or any of your
12  other attorneys, those are privileged and private and
13  between you and them.  So none of my questions today
14  are designed to have you give a response that reveals
15  a conversation you've had with Mr. Nate or
16  Mr. Hansen.  Do you understand that?
17       A.    Yes.
18       Q.    Great.  And the last one to allow us to
19  get started is, one of the things that -- I don't
20  think we'll be here too incredibly long today, but in
21  a deposition, we can take a break at any time for any
22  reason and you don't have to tell us what the reason
23  is.  However, the caveat we have with that is that if
24  I've asked a question, we like to get an answer to
25  that question and then take a break.  Does that make



Page 7

1    sense?

2         A.    Yes.

3         Q.    Okay.  We'll get started.

4               So Mr. Chipping, where are you currently

5    employed?

6         A.    Clearlink Insurance Agency.

7         Q.    And what is your current title?

8         A.    Director lead optimization.

9         Q.    Can you explain to me what lead

10   optimization is at Clearlink?

11        A.    I onboard a number of affiliate partners

12   and they send us phone calls, and my job is to

13   optimize the traffic.  "Traffic," referring to the

14   phone calls to the best of our ability to manage to a

15   cost per acquisition so it's profitable for us.

16        Q.    Now, cost per acquisition -- because I

17   think I've seen this referenced in the document quite

18   a bit -- is the shorthand for that CPA?

19        A.    Correct.

20        Q.    And so I just a want to go through some of

21   the terms of art that you mentioned in your answer.

22   Can you explain to me what onboarding is as it

23   relates to your job responsibilities?

24        A.    Sure.  I meet with a partner or an

25   affiliate; I ask them a series of questions, as far



Page 8

1    as how they are generating their traffic or their

2    leads; and we get paperwork signed by both parties.

3    And then there is the API integration so that they

4    are integrated with our system internally.  And

5    that's basically the onboarding process.

6         Q.    And so I think one of the first things you

7    said is that you asked the -- the partner a series of

8    questions.  Is that based on a script you have or

9    some kind of document that's been prepared?

10        A.    Not necessarily a script.  Been doing it

11   for a number of years and so just really trying to

12   get to know the partner.  And then the main thing is

13   how they are generating their traffic and just, kind

14   of, what strategies they're using to generate

15   traffic.

16        Q.    So you've said that you've been doing it a

17   number of years.  How long have you -- roughly, have

18   you been employed at Clearlink?

19        A.    Employed at Clearlink, 19 years.

20        Q.    And roughly how many of those years having

21   with working with affiliate partners?

22        A.    Seven.

23        Q.    And did you have other roles working with

24   affiliate partners that wasn't your current role?

25        A.    I was in sales for the first, I guess,



Page 9

1    12 years.  So -- did I work with them?  Not directly.

2    I -- I answered phone calls of traffic that came from

3    affiliate partners, but I did not manage them.

4        Q.    I understand.  Thank you.  So then

5    circling back to the questions that you would be

6    asking affiliate partners during onboarding.  I

7    understand that your testimony was that your goal is

8    to generally get to know them and how they're

9    creating traffic.  Is that a fair assessment?

10        A.    Yes.

11        Q.    Do you reduce your findings to writing

12    when you're interviewing a new potential affiliate

13    partner?

14        A.    Sorry, do I reduce them to writing?

15        Q.    Yes.  Sorry I was unclear.

16        A.    I don't understand the question.

17        Q.    Yeah, so if at the end of your interview,

18    when you're talking to a potential new affiliate

19    partner, do you have a practice of submitting a

20    report about the interview or taking notes about the

21    interview that's sent to a superior or a subordinate?

22        A.    No.

23        Q.    Who do you directly report to in your

24    role?

25        A.    Jason Kol.



Page 10

```
 1         Q.    Is that C-O-L-E?

 2         A.    K-O-L.

 3         Q.    And do you know Mr. Kol's title?

 4         A.    President marketing and sales solutions.

 5         Q.    Do you have employees of Clearlink that

 6    report directly to you?

 7         A.    One.

 8         Q.    And who's that individual?

 9         A.    Paisley Downing.

10         Q.    And do you know the name of Ms. Downing's

11    role?

12         A.    Senior affiliate coordinator.

13         Q.    Are there affiliate coordinators that

14    don't have the title senior?

15         A.    No.

16         Q.    Now, we've -- I've heard you testify a

17    couple of times using the term "affiliate partners,"

18    so just for the benefit of the record, can you

19    explain what an affiliate partner is in Clear Link's

20    business?

21         A.    Yeah.  An affiliate partner is someone who

22    sends us traffic or sends us phone calls.

23         Q.    Now, so you said "sends us traffic or

24    sends us phone calls."  So are -- do affiliate

25    partners generate potential leads for Clearlink using
```



Page 11

1   tools other than just phone calls?

2        A.    Well, there's -- yes.  So they can send us

3   phone calls; that's one.  They can also send us a

4   warm transfer, which is a phone call.  But it's

5   not -- we view them very similarly in that it is an

6   inbound phone call.

7        Q.    Understood.  So yeah, my -- my experience

8   in this space too, I also always thought that a warm

9   transfer was a phone call.  So then can you explain

10  to me how Clearlink may treat them differently?

11       A.    Well, Clearlink -- I mean, a warm transfer

12  is a lead that is originated via -- typically, via an

13  online form fill, where a customer would go online,

14  fill out their information, and submit -- hit submit.

15  They also are hitting the consent button of, I

16  consent to be contacted.

17            That's a warm transfer, when then the

18  affiliate partner is outbound dialing to that partner

19  and then they transfer to Clearlink.  An inbound

20  phone call is a customer or a consumer directly calls

21  Clearlink and there's no outbound call that was

22  originated.

23       Q.    Okay.  I understand the distinction.

24  Thanks for that explanation.

25            So then, do you know currently how many



Page 12

 1   affiliate partners of Clearlink utilize warm transfers?

 2        A.    I would say over a dozen.

 3        Q.    As part of -- actually, I'll -- strike

 4   that.

 5              For both of the phone call partners and

 6   the warm transfer partners, do they sign a contract

 7   with Clearlink?

 8        A.    Yes.

 9        Q.    Is that contract the same even though

10   they're engaged in different business practices?

11        A.    Is it the same?  Generally.  The language

12   is slightly different.  It specifies warm transfers

13   versus inbound calls.

14        Q.    Okay.  Yeah, and that was my question.  So

15   thanks for that explanation.

16              So am I correct, then, in my understanding

17   that both a phone call and a warm transfer affiliate

18   partner will sign a contract, but the warm transfer

19   partner will sign a slightly different contract than

20   the phone call partner?

21        A.    Every contract is slightly different.

22        Q.    Right.  I understand that, of course, you

23   know, if you're working with over a dozen affiliate

24   partners that are doing warm transfers, the names are

25   gonna be different.  Perhaps some of the pricing is



Page 13

1  different?

2        A.    Yeah.

3        Q.    But I guess that, maybe, perhaps, a more

4   specific question from me would have been, is there a

5   specific warm transfer partner contract?

6        A.    Other than it specifies the type of

7   traffic or the type of calls, it would say warm

8   transfers versus inbound calls.

9        Q.    Understood.  And do you -- and part of

10  your job responsibilities with Clearlink, do you use

11  IOs?

12       A.    We do.

13       Q.    Do you -- for each warm transfer partner,

14  is there a contract and an IO or sometimes just one

15  or the other?

16       A.    There is always a contract and an IO.

17       Q.    Do some warm transfer partners have more

18  than one IO?

19       A.    Not to my knowledge.

20       Q.    Okay.  So then, what, in your experience,

21  is included in the IO that is not included in the

22  contract?

23       A.    The IO is typically the terms of the

24  agreement, the price, like geography targeting, any

25  specifications of -- of types of calls that we're



Page 14

1  looking for.  I think the contract is more -- more

2  broad and I can't speak so much to the actual

3  contract.  I can speak more to the IO.

4      Q.    So as part of your job responsibilities at

5  Clearlink, does it have to do with preparing the IOs?

6      A.    Yes.

7      Q.    When you prepare the IOs, do you need to

8  get Mr. Kol's sign-off before you send them?

9      A.    No.

10     Q.    What types of information for the warm

11 transfer partners do you typically include in an IO?

12     A.    Name; address; the terms of the agreement,

13 meaning the price; how many calls per day we would

14 anticipate or expect; geotargeting, meaning which

15 states or which zip codes.

16     Q.    And under the terms of the IO, the warm

17 transfer partners have to make calls on behalf of

18 Clearlink adhering to those parameters?

19     A.    Ask that one more time.

20     Q.    I'd be happy to.

21          MR. PARONICH:  Ms. Palmer, if you got the

22 question, would you mind reading it back?

23          COURT REPORTER:  Sure.

24              (Whereupon, the reporter read the

25              record as requested.)



Page 15

```
 1              THE WITNESS:  I don't know if they are
 2   making calls on behalf of Clearlink, but they do make
 3   calls and then they transfer to Clearlink.
 4         Q.    BY MR. PARONICH:  Okay.  So the calls are
 5   made and they're transferred to Clearlink by -- and
 6   are you saying, then, the calls aren't on behalf of
 7   Clearlink?
 8         A.    So Clearlink would answer that warm
 9   transfer.  I don't know if the affiliate partner is
10   saying we're calling on behalf of Clearlink.
11         Q.    I see.  So then let me slightly rephrase
12   my question.
13              Then with respect to the IOs that you
14   prepare, the affiliate partners will be sending
15   telephone calls to try to generate new customers for
16   Clearlink, but they have to adhere to those
17   parameters.  Is that correct?
18         A.    Yes.
19         Q.    How do you determine what geotargeting
20   will be included in an IO?
21         A.    We typically look at performance and which
22   states are performing best for us.  It --
23         Q.    Oh, I'm sorry.  I didn't mean to interrupt
24   you.  Please continue.
25         A.    That's all.
```



Page 16

1      Q.    Okay.  So when you say "which states are
2  performing best for us," do you mean with respect to
3  that specific warm transfer partner or just generally
4  speaking?

5      A.    Initially, when we onboard, it's whatever
6  states have been performing for us historically.
7  Once we have a little bit of data, then we can adjust
8  the geotargeting based on that particular campaign.

9      Q.    And so what kind of data are you looking
10 at, in terms of making the determination of when to
11 adjust the geotargeting?

12     A.    So we look at conversation by state, sales
13 conversion by state, and that -- and then we adjust
14 it.  We can also go down to a zip code level, which
15 zip codes are performing better, and we adjust
16 accordingly.

17     Q.    And so do you ever have some warm transfer
18 partners calling in to certain states and other warm
19 transfer partners calling in to different states?

20     A.    Yes.

21     Q.    Is part of the analysis that Clearlink
22 engages in when working on the IO how many current
23 warm transfer partners they have in -- in a specific
24 state?

25           MR. NATE:  Objection.  Form.



Page 17

```
 1                Go ahead.
 2                THE WITNESS:  Do you want me to answer
 3    that?
 4                MR. PARONICH:  Yes.  And I'm sorry,
 5    Mr. Chipping, just 'cause I -- I know I've given you
 6    a lot of instructions, but just a reminder on one is,
 7    objections will happen a lot in depositions, and it's
 8    pretty rare -- it usually has to do with
 9    attorney-client privileged information if someone is
10    going to instruct you not to answer.
11                So the general rule is, if no one says
12    "Don't answer that," then you do answer if you
13    understand the question.
14                Does that make sense?
15                THE WITNESS:  Yes.  Can you repeat your
16    question?
17                MR. PARONICH:  I was actually just gonna
18    ask Ms. Palmer to read it back because I already
19    forgot it.
20                COURT REPORTER:  Sure.
21                MR. NATE:  Same objection.
22                Go ahead and answer if you can.
23                THE WITNESS:  Yeah.  We -- we do look at
24    how many warm transfer partners are in a certain
25    state, yes.
```



Page 18

1          Q.     BY MR. PARONICH:  And was your testimony
2    earlier, Mr. Chipping, that you had about a dozen
3    current warm transfer partners?
4          A.     That number can fluctuate, but currently,
5    about a dozen.
6          Q.     Yeah.  And that fluctuation is actually my
7    next question.  Is that the highest it's ever been in
8    your time in lead optimization?
9          A.     I don't know for sure.
10         Q.     Okay.  I think you also testified earlier
11   about API integration.  Do you recall that testimony?
12         A.     Yes.
13         Q.     Can you explain to me what API integration
14   is in the Clearlink business model?
15         A.     Sure.  Agent availability -- API is what
16   we call it.  When an affiliate partner has a phone
17   call to send to Clearlink through technology, they
18   are able to ping our API.  That will basically ask us
19   if we have an agent available.  If we do have an
20   agent available, we will respond with "accepted" or
21   "approved," and then the affiliate partner will send
22   us a call.  That is the vast majority of the API
23   integration.
24         Q.     Got it.  Thank you.  And I'll ask some
25   questions about that.  But first, just so I



Page 19

```
 1   understand, is every warm transfer partner integrated

 2   with the API before they can begin?

 3        A.    Yes.

 4        Q.    When -- do you know when that API

 5   integration process began?

 6        A.    It begins right after onboarding and right

 7   after the paperwork or contract is signed.

 8        Q.    And does every warm transfer partner have

 9   to be API integrated before they can begin sending

10   calls?

11        A.    Yes.

12        Q.    And is there a -- are you familiar with

13   the term "CRM" from your time in this business?

14        A.    Yes.

15        Q.    Is there a specific CRM that is linked to

16   the API integration?

17        A.    Yes.

18        Q.    And what is that?

19        A.    Clearlink uses our own CRM.

20        Q.    Got it.  Sorry.

21        A.    That's all.

22        Q.    And then I was gonna ask, do you guys have

23   a name for it?

24        A.    Sure.  There's two that we use primarily.

25   The first one is called LeadAmp and the second one is
```



Page 20

1  called Looker.

2      Q.    Can you explain to me the differences, if

3  any, between LeadAmp and Looker as it relates to the

4  warm transfer partners?

5      A.    LeadAmp is brand new this year; Looker is

6  a little bit older.  So both should be able to

7  provide the data.

8      Q.    Got it.  So I'll ask some questions about

9  Looker, then.  In order for a warm transfer partner

10  to be using Looker, do they need to have a username

11  and password?

12      A.    No.

13      Q.    Okay.  So if I went on to the Looker

14  website, would I be able to start pinging Clear

15  Link's API?

16      A.    No.  No.

17      Q.    Okay.  So then, if I was a new warm

18  transfer partner, what would I need to do in order to

19  get set up with Looker to be able to ping the API?

20      A.    If you are a new partner, you would be

21  integrated with LeadAmp.

22      Q.    Fair point.  If I was a partner from two

23  years ago and I -- what would I need to do to get

24  integrated with Looker to ping the API?

25      A.    We did not do an API integration two years



Page 21

1    ago.

2        Q.    Has the API integration only been when

3    LeadAmp has been utilized?

4        A.    That's correct.

5        Q.    Okay.  So then, when Clearlink was using

6    Looker, how did warm transfer partners communicate

7    transfers to Clearlink?

8        A.    They would work with me directly as to how

9    many transfers per day to send to us.

10        Q.    And how did you make the determination on

11    how many transfers per day an affiliate partner would

12    be able to send?

13        A.     It would be largely based on our head

14    count as to how many agents we had to answer

15    phones -- answer phone calls.  And I would try to

16    parse it out as best I could so that we could answer

17    everyone's traffic to the best of our ability.

18        Q.    Is there a formula that you used in order

19    to make that determination, or was it just based on

20    your experience in the field?

21        A.    Based on experience in the field.

22        Q.    Got it.  And would every affiliate

23    partner -- every warm transfer partner, excuse me,

24    have the same amount of potential transfers that they

25    could send each day?



Page 22

```
 1        A.    No.
 2        Q.    How would you determine which warm
 3   transfer partners would get more?
 4        A.    Performance-based, sales --
 5        Q.    Yeah, and so when you say
 6   "performance-based," does that mean based on CPA?
 7        A.    Yes.
 8        Q.    Was CPA the sole indicator that you would
 9   use to just determine performance?
10        A.    No.
11        Q.    Okay.  What other indicators would you use
12   to determine performance?
13        A.    Lifetime value, retention -- yeah.
14   Lifetime value and retention.
15        Q.    Okay.  So then, when you made the
16   determination on -- that a warm transfer partner
17   would be sending over a certain amount of leads, how
18   would they do it?  How would they make the transfer
19   itself?
20        A.    The affiliate partner has a call center,
21   to my understanding.  They would make an outbound
22   dial to these leads that would be originated via the
23   online form-fill.  And they would outbound dial them
24   and talk to them -- talk to the customer and ask them
25   if they would be interested in getting Medicare, and
```



Page 23

1    there is a very small script that they would follow

2    that we would instruct them to follow.  And if

3    they -- if a customer met that criteria, then they

4    would transfer the call to Clearlink.

5        Q.    Okay.  On the -- when they're actually

6    transferring the call, is there a specific phone

7    number they're sending it to?

8        A.    Yes.  They have their own -- we call it a

9    DID, direct inbound dial.

10       Q.    Each warm transfer partner has their own

11   DID?

12       A.    That's correct.

13       Q.    Okay.  You had mentioned that there was a

14   script that Clearlink uses to -- and instructs the

15   affiliate partners on.  Is that part of the contract?

16       A.    Yes.  It's part of the IO.

17       Q.    Got it.  Is the actual script itself

18   included in the IO?

19       A.    There's three questions that we ask the

20   affiliate partner to ask each customer, and those

21   three questions are in the IO.

22       Q.    Got it.  And you had said that the

23   affiliate partner has a call center.  Correct?

24       A.    That's my understanding, yes.

25       Q.    But isn't it also true that some affiliate



Page 24

1    partner's have multiple call centers?

2        A.    That is my understanding, yes.

3        Q.    And did Clearlink ever check to send

4    potential traffic to Clearlink?

5            MR. NATE:  Objection.  Foundation.  Oh,

6    pardon me.  Go ahead.  Form.  My apologies.  I'm

7    getting used to the new rules here.

8            Go ahead and answer.

9            MR. PARONICH:  You're good.

10           THE WITNESS:  Did we limit the amount of

11   call centers?  Sometimes, yes.

12       Q.    BY MR. PARONICH:  And how did Clearlink

13   communicate that limitation?

14       A.    I would communicate it to the affiliate

15   partner.

16       Q.    And could you give me an example of a time

17   that you communicated that limitation to an affiliate

18   partner?

19       A.    Sometimes the customer experience -- if

20   the call center is offshore, meaning not in the

21   United States, sometimes it is a not -- not a great

22   customer experience because of the language barrier.

23   And sometimes we would put limitations on offshore

24   call centers.

25       Q.    On -- did you ever communicate to an



Page 25

1    affiliate partner a desire to limit any offshore call

2    centers?

3         A.    Yes.

4         Q.    Which affiliate partner did you

5    communicate that to?

6         A.    There's been several.

7         Q.    Can you name them?

8         A.    I can name a handful.  I don't know if it

9    would be a comprehensive list.

10        Q.    I understand.  Please name the handful

11   that you can.

12        A.    Digital Media Solutions, Aragon.  Those

13   are the top two that come to mind.

14        Q.    And when you tendered that instruction

15   to -- actually, I'll strike that.

16              Mr. Chipping, today, if I use the acronym

17   DMS, will you understand that I mean Digital Media

18   Solutions?

19        A.    Yes.

20        Q.    Okay.  And when you tendered that

21   instruction to DMS or Aragon, was it your

22   understanding that the instruction was followed?

23        A.    Yes.

24        Q.    And how did you come to the conclusion --

25   or, let me strike that.



1          How did you come to the understanding that
2    the instruction was followed?
3          A.    The affiliate partner would say that we
4    could focus on inbound calls more than warm transfer,
5    meaning they would send us less transfers and more
6    inbound calls.  And then they would also say they
7    would do their best to -- 'cause, again, they have
8    multiple call centers and they would do their best to
9    send onshore transfers versus offshore transfers.
10         Q.    Understood.  And was your understanding
11   that DMS utilized both onshore and offshore call
12   centers to sent warm transfers to Clearlink?
13         A.    That was my understanding.
14         Q.    You had mentioned the online form fill.
15   Do you recall that testimony?
16         A.    Yes.
17         Q.    Did Clearlink ever participate with any of
18   the vendors, in terms of the content of what the
19   online form looked like?
20         A.    Yes.
21         Q.    And do you recall any of the partners that
22   Clearlink engaged in that participation with?
23         A.    Every single partner that we onboard,
24   we -- part of the vetting process and onboarding
25   process is we verify their lead form and we -- we



Page 27

1    place a test lead as if we were a consumer, and we

2    verify that they are capturing the right information

3    and that it -- that it meets compliance.

4        Q.    And when you say "that it meets

5    compliance," is that an analysis that you perform?

6        A.    That would be generally our in-house

7    counsel.

8        Q.    Understood.  And do you know if the

9    results of any of those test leads are reduced to a

10   writing that is part of the file?

11       A.    I don't understand the question.

12       Q.    Sure.  So part of the compliance process

13   is that Clearlink would place a test lead, correct?

14       A.    Correct.

15       Q.    And so when that test lead would be

16   placed, what would happen next, after the website

17   visit is completed?

18       A.    Yeah, we -- we ask the affiliate partner

19   to send us either the Jornaya token or Trusted Form

20   token.  That's what captures the time-stamp of this

21   lead and the opt-in.  And so we ask for that to be

22   sent back to us so that we know that they are

23   capturing it on every lead.

24       Q.    Understood.  Did Clearlink ever ask

25   Jornaya or Trusted Form tokens for non-test leads?



Page 28

```
 1              MR. NATE:  Objection.  Form.

 2              Go ahead.

 3              THE WITNESS:  We would -- for any warm

 4    transfer campaign, we would always require either

 5    Jornaya or Trusted Form.

 6         Q.    BY MR. PARONICH:  And would Clearlink

 7    receive a Jornaya or Trusted Form for every warm

 8    transfer?

 9         A.    Yes.

10         Q.    Where would that be placed?

11         A.    So a clarifying answer.  The affiliate

12    partner holds the token or the proof of the opt-in,

13    Clearlink does not hold it in-house.  So if there's

14    ever a question or a customer complaint, we would go

15    to the affiliate partner to ask for the opt-in and

16    that Trusted Form token.

17         Q.    And whenever Clearlink asked for an opt-in

18    from its affiliate partner, did they respond?

19         A.    Yes.

20         Q.    And did they provide them?

21         A.    Yes.  In most cases, to my knowledge.

22         Q.    Do you have any specific recollection of a

23    time that Clearlink requested a token and the

24    response was not provided?

25         A.    No.
```



Page 29

1          Q.    Did Clearlink have any processes in place

2     to make sure that the three questions that were

3     required in the scripting were being asked?

4                MR. NATE:  Objection.  Form.

5                Go ahead.

6                THE WITNESS:  We didn't actively live

7     listen to calls.  We -- we entrusted the -- the

8     affiliate partner to ask these questions.  In the

9     event that there was a complaint, we would pull the

10    call -- our leg of the call of when it was

11    transferred to us.

12               Keep in mind, the affiliate partner is

13    making the outbound call so Clearlink doesn't have

14    that first recording.  We don't know 'cause we don't

15    own that phone call -- that leg of the call.  We only

16    own the call when it comes into Clear Link's system.

17         Q.    BY MR. PARONICH:  I understand that.  But,

18    I guess, I'm not really sure if I got an answer to my

19    question, which was, does Clearlink take any steps to

20    ensure that those three scripted questions are being

21    asked?  I understand that there's no live listening;

22    I don't understand if there are any other steps

23    taken.

24               MR. NATE:  Objection.  Form.

25               Go ahead.



Page 30

```
 1              THE WITNESS:  No.
 2       Q.    BY MR. PARONICH:  Has Clearlink ever
 3   terminated a warm transfer partner?
 4       A.    Yes.
 5       Q.    Who?
 6       A.    DMS and Aragon.
 7       Q.    Why was DMS terminated?
 8              MR. NATE:  Objection.  Form.
 9              Go ahead.
10              THE WITNESS:  I was advised to pause the
11   campaign in light of this case.
12       Q.    BY MR. PARONICH:  Understood.  Had DMS
13   ever -- actually, I'll strike that.
14              Is your understanding if Aragon is related
15   to DMS in any way?
16       A.    Not to my understanding.
17       Q.    Okay.  But Aragon was also terminated,
18   correct?
19       A.    Yes.  There were a handful of TCPA
20   violations and we wanted to mitigate that risk.
21       Q.    Understood.  When was Aragon terminated?
22       A.    A year ago.
23       Q.    Do you know if it was before or after the
24   filing of this case?
25       A.    I don't know for sure.  I don't know when
```



Page 31

1    this case was filed.

2         Q.    Okay.  So I want to talk a little bit more

3    about the onboarding process.  A contract has to be

4    signed, correct?

5         A.    Yes.

6         Q.    And currently, an API integration has to

7    happen, correct?

8         A.    That's correct.

9         Q.    And an IO has to be signed before any

10   calling can take place?

11        A.    Correct.

12        Q.    So I understood those three steps and

13   thank you for their explanation.  But my question is,

14   other than those three steps, does anything else have

15   to occur before a warm transfer partner can begin

16   sending calls?

17        A.    The test lead that we always place.

18        Q.    That's right.  Other than, we'll say,

19   those four steps, does anything else have to be done

20   before a warm transfer partner can start making

21   calls?

22        A.    We generate a phone number for them, but

23   that's basically it.

24        Q.    When you say you generate a phone number,

25   is that that DID you testified to earlier?



Page 32

```
 1        A.    Yes.
 2        Q.    Is there any other training that happens
 3   for Clearlink with the warm transfer partners before
 4   they can begin?
 5        A.    So our -- our licensed agents who are
 6   answering the phone calls, they will know if it's
 7   a -- a warm transfer or if it is an inbound call.
 8   So, I guess, there's that training.
 9        Q.    Got it.  Does Clearlink ever see if any of
10   the transfers that are coming in are numbers that are
11   listed on the Do Not Call Registry?
12             MR. NATE:  Objection.  Form.
13             Go ahead.
14             THE WITNESS:  Yes.  So if it is on the Do
15   Not Call Registry and if we know about it, we will
16   add it to our Do Not Call or we add it internally to
17   our system.  But if we don't know about it, then we
18   wouldn't have a way to know that.
19        Q.    BY MR. PARONICH:  I understand.  But I
20   think my question was a little different.  Mine was
21   asking if you're aware of if Clearlink has a warm
22   transfer that comes in -- which will, obviously, be a
23   phone number from a consumer, correct?
24        A.    Yeah.
25        Q.    And if Clearlink then ever takes the step
```



Page 33

1    to see if that phone number is listed on the national

2    Do Not Call Registry.

3              MR. NATE:  Objection.  Form.

4              Go ahead.

5              THE WITNESS:  No.  We cannot see that.

6         Q.   BY MR. PARONICH:  Well, you said Clearlink

7    cannot see that.  Does Clearlink have a national Do

8    Not Call Registry subscription?

9         A.   I don't know.

10        Q.   And does Clearlink -- I understand that

11   there are a series of affiliate partners that

12   Clearlink works with.  But are any of those affiliate

13   partners currently doing warm transfers?

14        A.   Yes.

15        Q.   Are there some affiliate partners that are

16   doing warm transfers that generate more leads for

17   Clearlink than others?

18        A.   Yes.

19        Q.   What is the warm transfer partner that's

20   currently generating the most transfers?

21        A.   Do you want the name of the partner who's

22   sending us the most today?

23        Q.   I do.

24        A.   Centerfield.

25        Q.   Do you know the name of the partner that



Page 34

1     is sending the second most, behind Centerfield?

2          A.     Fluent.

3          Q.     So I understand then.  Centerfield would

4     be first and then there would -- Fluent would be

5     second.  Do you know offhand who would be third?

6          A.     What If Direct.

7          Q.     Okay.  And you maybe can assume my next

8     question.  Do you know who would be fourth?

9          A.     No.

10         Q.     When DMS was sending warm transfers to

11    Clearlink, were they number one on that list?

12         A.     As far as volume?

13         Q.     Yes.

14         A.     No.

15         Q.     Would they have been -- you had just

16    explained who was currently the top three.  Were they

17    sending more than either of those three?

18                MR. NATE:  Objection.  Form.

19                Go ahead.

20                THE WITNESS:  So were they sending more

21    than -- than our top three are today?

22         Q.     BY MR. PARONICH:  Yes.  That is my

23    question.

24         A.     Well, in Medicare there's seasonality, so

25    there's -- there's different times of the year where



Page 35

1  we would take more calls than other times of the

2  year.  So if you're asking about DMS during open

3  enrollment period compared to the top three that I

4  just gave you today when we're outside of open

5  enrollment period, yes, DMS would have been sending

6  us more calls.  If you're -- but it's not an apples

7  to apples comparison based on seasonality.

8       Q.    That's a very good point.  I understand.

9  So then let me ask the question differently; which

10  is, when DMS was sending transfers during the time

11  that they were, were they one of the top warm

12  transfer partners in terms of volume?

13       A.    I think it's fair to say they were top

14  five.

15       Q.    Okay.  Now, I understand that you

16  testified earlier that there are both these phone

17  call partners and the warm transfer partners.  But

18  what I want to make sure I understand is, does

19  Clearlink -- do Clearlink agents themselves make any

20  outbound calls that were not in response to a warm

21  transfer or to an inbound call?

22            MR. NATE:  Objection.  Form.

23            Go ahead.

24            THE WITNESS:  Two years ago we would -- we

25  would generate -- if we spoke to a customer outside



Page 36

1   of open enrollment and the customer was not eligible

2   for Medicare at the time, but they were eligible

3   during open enrollment period, yes, we would outbound

4   dial customers during AEP, the annual enrollment

5   period.

6        Q.    BY MR. PARONICH:  Got it.  And when you

7   say that Clearlink would outbound dial customers

8   during AEP, does that mean individuals that already

9   had a relationship with Clearlink?

10       A.    Yes.  They had already spoken to our

11  licensed agents and agreed to be contacted during AEP

12  when they were eligible.

13       Q.    Got it.  So then I'll ask my question in a

14  slightly different way.  So then, other than those

15  follow-up AEP calls, did -- does Clearlink make any

16  outbound calls that are not in response to a warm

17  transfer or an inbound call?

18            MR. NATE:  Objection.  Form.

19            Go ahead.

20            THE WITNESS:  No.

21       Q.    BY MR. PARONICH:  During your seven years

22  at -- as part of this lead optimization period, has

23  Clearlink ever made such calls?

24       A.    Not to my knowledge.

25       Q.    Okay.  So in terms of outbound phone calls



Page 37

1    that are made to generate potential customers for

2    Clearlink, other than those specific AEP calls you

3    discussed, those are all done by third party and

4    their call centers?

5         A.    Correct.

6         Q.    So, Mr. Chipping, how did you communicate

7    with the affiliate partners?  Was there a preferred

8    mode of communication, such as email or Skype or a

9    messaging service?

10        A.    Both email and Zoom.  Occasionally, for

11   partners that I had a long-standing relationship

12   with, I have their cell phone, so via cell phone as

13   well.

14        Q.    Got it.  So then in terms of any written

15   communications that exist, would those just be via

16   email or do you use Zoom messaging as well?

17        A.    Terms of agreements change frequently,

18   again, based on seasonality.  And so typically it

19   would just be an email, typically.

20        Q.    Got it.  Did you ever use a -- did you

21   ever use text messaging to communicate with any

22   affiliate partners?

23        A.    It has happened, yes.

24        Q.    Okay.  And would you do that on a company

25   phone or on your own personal phone?



Page 38

```
 1        A.    My own personal phone.
 2        Q.    And again, I'd like to remind you that my
 3   questioning, it's never intended to under- -- to hear
 4   any communications that you've had with your
 5   attorneys, so I'm gonna ask this in a very specific
 6   way.  But have you performed any searches of your
 7   phone for any communications as part of discovery in
 8   this case?
 9        A.    No.
10        Q.    Is Paisley's last name pronounced Downing?
11        A.    Yes.
12        Q.    Okay.  Do you know if Ms. Downing has also
13   sent text messages to affiliate partners?
14        A.    Not to my knowledge.
15        Q.    Okay.  Do all of the affiliate partners
16   that are sending warm transfer calls, are those all
17   for Medicare-eligible individuals?
18        A.    The goal is to have them Medicare
19   eligible, yes.  It is our Medicare vertical that
20   sends us warm transfers, yes.
21        Q.    Understood.  And does Clearlink insurance
22   get warm transfers in any other vertical?
23        A.    Not today.
24        Q.    Roughly, when was the last time they got
25   transfers in a different vertical?
```



Page 39

1      A.      Several years ago.  We were in the P&C

2    space, home and auto insurance, and we would with

3    that as well.

4      Q.      Understood.  Would it be fair to say that

5    that was more than three years ago?

6      A.      Yes.

7      Q.      Does Clearlink have its own internal Do

8    Not Call list?

9      A.      Yes.

10     Q.      Is that internal Do Not Call list sent to

11   warm transfer partners?

12     A.      Yes.  And -- well, we communicate them

13   typically as a -- as a one-off.  But we also share

14   that with them as part of the onboarding and telling

15   them who not to contact.  But if there's any new

16   individuals that we need to add to the list, I do my

17   best to communicate that to them.

18     Q.      Understood.  And so, Mr. Chipping, you've

19   testified today about a company called DMS, correct?

20     A.      Yes.

21     Q.      And was your understanding that DMS was

22   one of Clear Link's affiliate partners that generated

23   warm transfers?

24     A.      Yes.

25     Q.      And who is your main point of contact at



Page 40

1    DMS?

2         A.    At what point?

3         Q.    Yeah.  Fair question.  So did -- I'll ask

4    it this way:  Did you have multiple points of contact

5    at DMS during your relationship with them?

6         A.    Yes.

7         Q.    How long was DMS affiliate partner of

8    Clearlink?

9         A.    Five years.

10        Q.    When the relationship was terminated by

11   Clearlink with DMS, who was your main point of

12   contact there?

13        A.    It's been over a year since I've worked

14   with DMS.  So there's Courtney, there is Rob Camhe.

15   Rob is -- is my most recent interaction and contact.

16   Rob Camhe.

17        Q.    Understood.  And so have you personally

18   had any conversations with any DMS employees about

19   this litigation?

20        A.    I'm on an email chain with our general

21   counsel, so I've seen communication back and forth.

22   I don't believe that I have written any emails, but

23   I'm on the email thread when this case was opened.

24        Q.    Thank you.  And I should have asked a more

25   precise question.  I was asking if you had any oral



Page 41

1   conversations with any employees of DMS about this
2   litigation.
3           A.      No.
4           Q.      Any are you familiar with a company called
5   Aragon Advertising Company?
6           A.      I am.
7           Q.      And who was your main point of contact at
8   Aragon Advertising?
9           A.      Chandler Andrewsen.
10          Q.      Circling back to DMS for a moment,
11  Mr. Chipping, were you responsible for onboarding
12  DMS?
13          A.      I don't recall.  It's possible they were a
14  standing partner when I stepped into this position.
15          Q.      Were you responsible for onboarding Aragon
16  Advertising?
17          A.      Yes.
18          Q.      How did you locate them as a potential
19  affiliate partner?
20          A.      At an affiliate summit or a LeadsCon
21  conference, which I attend every year.
22          Q.      And how long was Aragon Advertising a
23  partner -- an affiliate partner of Clearlink?
24          A.      Three or four years.
25          Q.      And did you testify earlier that it was



Page 42

1   due to a series of TCPA violations that that

2   relationship was terminated?

3        A.    Yeah, there was -- that was -- that was

4   part of it.  That wasn't all of it.

5        Q.    What were the other parts of it?

6        A.    Last year we had a company by the name of

7   PX that we worked with.  We routed the calls via PX.

8   And Aragon and PX, for one, didn't agree with each

9   other's strategies and PX limited the amount of

10  volume that Aragon could send to us.  And as a

11  result, Aragon stopped sending traffic, because they

12  weren't getting paid enough.

13       Q.    Understood.  And then Clearlink also made

14  the decision to terminate the relationship for

15  compliance issues?

16       A.    Correct.

17       Q.    Got it.  So can you explain to me PX's

18  role a little bit?  I guess I was confused by that,

19  how they channel traffic, if that was the phrase you

20  used.

21       A.    Yeah.  PX was -- largely, they're an

22  aggregator.  PX is a company that buys and sells

23  leads and then they funnel them to different

24  companies.  Clearlink was one of the companies that

25  PX would funnel leads to.  So -- yeah.  That's the



Page 43

 1    gist of it.

 2        Q.    Got it.  During any of these TCPA

 3    compliance issues with Aragon, would you speak to

 4    anyone other than Mr. Anderson?

 5        A.    His last name is Andrewsen.

 6        Q.    Oh, okay.  Sorry about that.  Then I'll --

 7    strike that.

 8              During these TCPA compliance issues, would

 9    you discuss them with anyone other than

10    Mr. Andrewsen?

11        A.    Yes.

12        Q.    Who else?

13        A.    Todd Stern, CEO.

14        Q.    I'm sorry, just for the benefit of the

15    record, Mr. Stern's the CEO of Aragon?

16        A.    That's correct.

17        Q.    Other than Mr. Stern and Mr. Andrewsen,

18    who else did you discuss those with?

19        A.    Alec Stern.

20        Q.    Is that A-L-E-C?

21        A.    A-L-E-C, yes.

22        Q.    And do you know where Aragon's company is

23    physically located?

24        A.    Yeah.  Brooklyn, New York.

25        Q.    And do you know if Todd and Alec Stern are



Page 44

1    also physically located in Brooklyn, New York?

2         A.    They're in New York.  I'm confident that

3    Alec is on Long Island.  I don't -- I think Alec is

4    in New York, but I don't know which part.

5         Q.    Understood.  And I just want to make sure

6    I did actually -- are you saying that you're

7    confident that Todd's in Long Island?

8         A.    That's correct.

9         Q.    Okay.  And you don't know what part of New

10   York for Alec; is that correct?

11        A.    I'm confident that it's Brooklyn, but I'm

12   not 100 percent.

13        Q.    Okay.  When Aragon was sending warm

14   transfers, prior to PX being involved, where would

15   they generally rank in terms of volume?

16        A.    They were probably number one.

17             MR. PARONICH:  I'd say I'm about halfway

18   done, if not a little more, so I suggest we take a

19   ten-minute break just to stretch the legs and then

20   I'll come on and finish it up for -- if that works

21   for everyone.

22             THE WITNESS:  Okay.

23             MR. NATE:  Sounds great.

24             MR. PARONICH:  We'll see you at 12:55

25   Eastern.



Page 45

```
 1                    (Whereupon, a recess was taken
 2                    from 11:46 a.m. to 11:58 a.m.)
 3         Q.    BY MR. PARONICH:  So Mr. Chipping, are you
 4    familiar with a company called What If Direct?
 5         A.    Yes.
 6         Q.    And did you onboard What If Direct or were
 7    they an existing partner?
 8         A.    I believe I onboarded them.
 9         Q.    And do you know where you located them as
10    a potential warm transfer partner?
11         A.    I don't recall specifically.  I'd be
12    speculating if I guessed.
13         Q.    Has -- since you've been in charge of warm
14    transfer partners at Clearlink, have all of those
15    relationships began with a meeting at LeadsCon or
16    affiliate -- an affiliate summit?
17              MR. NATE:  Objection.  Form.
18              Go ahead.
19              THE WITNESS:  Either at a conference like
20    LeadsCon or affiliate summit or via an introduction
21    to someone else within the organization that has
22    introduced me to them via email.
23         Q.    BY MR. PARONICH:  Got it.  And does Clear
24    Link's relationship with What If Direct continue to
25    this day?
```



Page 46

1          A.    Yes.

2          Q.    Okay.  And are you familiar with any

3    complaints of calls to numbers on the Do Not Call

4    list associated with What If Direct?

5          A.    I would imagine that there may have been

6    some, but nothing stands out to me.

7          Q.    Are you familiar with any involvement in

8    TCPA lawsuits that What If Direct has had previously?

9          A.    I believe that they were listed in -- in

10   one, but it -- my memory is a little foggy on that.

11   So I don't know --

12         Q.    When you're -- I'm sorry, go ahead.

13         A.    I don't know for sure.

14         Q.    When you say your memory is that they were

15   listed in one, does that mean that they were listed

16   in the lawsuit that involved Clearlink?

17         A.    No.

18         Q.    Okay.  So is your memory that they may

19   have been involved in one TCPA lawsuit generally?

20         A.    Yes.

21         Q.    Is part of the onboarding process with

22   companies asking -- does Clearlink or -- let me

23   strike that.

24               Do you ask, as part of the onboarding

25   process, if companies have ever been involved in any



Page 47

1    TCPA lawsuits?

2         A.    We do.  We do ask that.

3         Q.    And did you ask that question to DMS?

4         A.    I don't recall.  I don't recall if I

5    onboarded them.

6         Q.    And have you ever been involved in the

7    handling of complaints of unlawful calling, other

8    than this lawsuit, as part of your job

9    responsibilities at Clearlink?

10              MR. NATE:  Objection.  Foundation.

11              Go ahead.

12              THE WITNESS:  Yes.

13         Q.    BY MR. PARONICH:  Okay.  And what is your

14    role in investigating those complaints?

15         A.    If there is a customer complaints that

16    they did not agree to be contacted, between myself

17    and our telophony team or ops team, we can look up

18    via promo code or DID where the call came from, and

19    so we can find the affiliate partner.

20              And then I will typically reach out to the

21    affiliate partner and request the opt-in of -- of

22    this phone call that is in question.  Or where the

23    complaint came from.  And we ask them to provide the

24    opt-in.

25         Q.    What is -- I've seen that in some of the



Page 48

1    documents.  So in Clear Link's business, what is a
2    promo code?
3        A.    Oh, that -- it's just a five- or six-digit
4    number that identifies who is who.
5        Q.    Got it.  And so it doesn't have to do with
6    how any of the affiliate partners are treated or
7    pricing or any of that?
8        A.    Not at all.
9        Q.    And so how is Clearlink able to determine
10   which warm transfer partner sent a lead that has
11   since complained?  Is that based on the DID number?
12       A.    So we see where the call was -- so when
13   a -- when an affiliate partner sends us a call, we
14   receive both the -- the DID of -- that is tied to the
15   affiliate partner, as well as the customer's caller
16   ID.  So we receive two numbers.  So that's how we tie
17   it to it.  'Cause we can see them.
18       Q.    Got it.  So as part of these complaints,
19   are you aware if Clearlink has ever settled any
20   allegations of unlawful calling?
21       A.    Against Clearlink or against --
22       Q.    Yeah.  Against Clearlink.
23       A.    Well, I'm aware that Clearlink has -- yes,
24   but, again, there's context to that.  I don't know --
25   I mean, it's -- there's indemnification that we have,



Page 49

1    so it's -- ultimately, Clearlink likes to put the
2    onus on the affiliate partner versus on us, since the
3    call was originated by the affiliate partner.
4        Q.    Understood.  And I think I got all that
5    context, but let me lay it out to make sure I did.
6              So your understanding is that Clearlink
7    has paid money to resolve claims of unlawful calling,
8    correct?
9        A.    Yes.
10       Q.    But is -- but your understanding is also
11   that in all of those situations Clearlink has then
12   gone to the affiliate partner that transferred the
13   lead and collected that same amount of money?
14       A.    That's correct.
15       Q.    Okay.  And do you know if that has
16   occurred more than three times?
17       A.    I would say it's happened more than three
18   times.
19       Q.    Do you know if it's happened more than
20   ten?
21       A.    I don't know for sure.
22       Q.    Prior to this lawsuit, had it ever
23   happened with DMS?
24       A.    I would say yes.
25       Q.    Okay.  So with respect to the affiliate



Page 50

1    partners, has Clearlink ever hired a third party

2    that's not a law firm to engage in an audit of the

3    affiliate partner's calling practices?

4                MR. NATE:  Objection.  Form.

5                Go ahead.

6                THE WITNESS:  Not that I know of.

7        Q.    BY MR. PARONICH:  Okay.  Do you know of

8    any audits that have occurred that were performed on

9    affiliate partners by law firms?

10               MR. NATE:  Objection.  Form.

11               Go ahead.

12               THE WITNESS:  Not that I know of.

13       Q.    BY MR. PARONICH:  So in these prior

14   instances, where Clearlink has resolved claims for

15   unlawful calling for money and then collected that

16   same money from the affiliate partner, has anything

17   about the business relationship between Clearlink and

18   the affiliate partner changed?

19               MR. NATE:  Objection.  Form.

20               THE WITNESS:  So there's, obviously, a

21   conversation.  I would have a conversation with the

22   affiliate partner and oftentimes how these TCPA

23   claims go is there's a settlement for a dollar amount

24   and it's -- even -- even if the affiliate partner is

25   able to provide a valid opt-in, if opposing counsel



Page 51

1    doesn't believe it or doesn't necessarily think it's

2    legitimate, they continue to -- to file charges.  And

3    so the affiliate partner, in my experience, has just

4    settled instead of going to court because it's less

5    expensive to settle.

6             And so in every -- I mean -- yeah, that's

7    my answer.

8        Q.    Okay.  And so then, in every -- is it your

9    testimony that in every instance that Clearlink has

10   received a complaint about unlawful calling, there's

11   been a valid opt-in, but the affiliate partner

12   decided that they'd rather just settle as opposed to

13   fight?

14       A.    That's my understanding.

15       Q.    Okay.  And how did you make the

16   determination that the opt-in was valid?

17       A.    Well, when we -- when we reach out to the

18   affiliate partner and they provide us with the

19   same -- I mean, it looks like the Jornaya or the

20   Trusted Form token as to when we -- when we were

21   initially onboarding and vetting them, and we placed

22   that test lead.  If it -- if it meets not only my

23   criteria but also our general counsel's criteria,

24   that historically has been good enough for us.

25       Q.    Understood.



Page 52

```
 1              MR. PARONICH:  So I'm gonna get to the
 2    part now where I introduce a series of exhibits.  So
 3    have you thought about, do you want to go off the
 4    record and get those to him?
 5              MR. NATE:  I think that would be easiest.
 6    I had Neal grab his laptop.
 7              MR. PARONICH:  So, Ms. Palmer, we'll
 8    quickly go off.  And just so everyone knows, I'm
 9    about to load -- I'll just load all of them at once.
10    That would be all of the potential exhibits, but I'm
11    just gonna go through them one by one and I'll mark
12    them as exhibits orally based on which ones I decide
13    to use.  But I'll just give you the entire universe
14    of what I might use now.
15              (Discussion held off the record.)
16         Q.   BY MR. PARONICH:  Okay.  Mr. Chipping, you
17    have a series of documents electronically available
18    to you.  So these have what we call Bates stamps in
19    lawsuits and that's what the numbers are.  And just
20    so you know which one to open, that's how I'll refer
21    to them.
22         A.   Okay.
23         Q.   So the Exhibit 1 will be 8713.  If you
24    could please pull that up and let me know when you
25    have.
```



Page 53

1        A.    I believe I have it.

2        Q.    Okay, great.  And this is an email thread

3   that was produced to us in this case by -- by

4   Clearlink.  Like -- I don't know if you've ever

5   printed out or seen an email thread that's been, you

6   know, printed in paper before, but all of them today

7   that we'll be looking at, they're in reverse

8   chronological order.  So do you know what I mean by

9   that?

10        A.    Start at the bottom?

11        Q.    Yeah, that's exactly right.

12        A.    Okay.

13        Q.    So I understand that Clearlink, of course,

14   had a relationship with DMS, correct?

15        A.    Correct.

16        Q.    But did Clearlink also have a relationship

17   with Crisp?

18        A.    They did, yes.

19        Q.    Okay.  And is your understanding that at

20   some point DMS acquired Crisp?

21        A.    That was my understanding.

22        Q.    So even though that happened, did

23   Clearlink track leads that were sent by Crisp

24   different from leads that were sent by DMS?

25        A.    Track?  All leads are tracked typically



Page 54

```
 1    the same.

 2        Q.    Understood.  Let me ask it a different

 3    way.  Did Crisp and DMS have the same DID numbers to

 4    send warm transfers to?

 5        A.    No.

 6        Q.    And were they kept separate, in terms of

 7    DID numbers, even after DMS acquired Crisp?

 8        A.    That is correct.

 9        Q.    I'm also gonna refer to the numbers of --

10    the page numbers of the PDF 'cause I think that's

11    easiest to track.

12        A.    Okay.

13        Q.    So then on Page 4 of this document, there

14    is an email from Ms. Ness to you on April 7th at

15    1:17 p.m.  Do you see that?

16        A.    Yes, I believe so.

17        Q.    Can you explain to me your understanding

18    of "leads are exclusive" and what that means in this

19    context?

20        A.    If I'm -- if I'm understanding which email

21    you're referring to, it says:  Hey Neal, leads are

22    exclusive.  And yes, we can lockdown a direct bid.

23    What are you thinking?

24              Is that the one?

25        Q.    It is.
```



Page 55

1        A.    So she -- so Kattie is asking -- or, she

2   is saying that their leads are exclusive, as in a

3   data lead, is how I would interpret that.  Data lead

4   is different than an inbound call or a warm transfer.

5   And exclusive means that they are owned and operated

6   and sent only to Clearlink versus any other buyer.

7        Q.    Understood.  Those are all the questions I

8   have for that document.

9              Then Exhibit 2 will be the next document

10  down, which is 8739.  Just let me know when you have

11  that one pulled up.

12       A.    I have it.

13       Q.    In the first email here, it is an email to

14  Mike Myles to Abby Rosenberger.  Who is

15  Ms. Rosenberger?

16       A.    She is a former marketing director.

17       Q.    And is that the role that Paisley holds

18  currently, or am I misunderstanding?

19       A.    You're misunderstanding.

20       Q.    Okay.  Oh, is her position what Mr. Kol

21  currently has?

22       A.    No.  Abby is no longer part of the

23  Medicare team.  She is part of Clearlink, but she has

24  moved on to a different role.

25       Q.    Understood.  But during this July 2020



Page 56

1    time frame, can you explain to me what she was doing

2    per this role?

3        A.    Oh, yes.  She -- I reported to Abby.  She

4    was the marketing director at the time.

5        Q.    Understood.  In this first email, there's

6    a mention of supplying leads and traffic to your

7    form.  Do you see that?

8        A.    Can I read the email?

9        Q.    Of course.  Take your time and let me know

10   when you're ready.

11       A.    Okay.  I see -- I've read the email.

12       Q.    And so can you explain to me what your

13   understanding is of both supplying leads and traffic,

14   as referenced in this email?

15       A.    My understanding or my interpretation of

16   that would be leads as, again, data leads.  If we

17   wanted to buy data leads and make outbound dials.

18   And then traffic would be either inbound calls or

19   warm transfers.

20       Q.    Understood.  Thank you.

21             So we're actually gonna jump down for

22   Exhibit 3 to 8820.  Let me know when you have a

23   chance to pull that up.

24       A.    I have it.

25       Q.    I'm going to be asking you to start -- a



Page 57

1    question about the last email here, right, so the

2    oldest one in the thread.  So if you could please

3    read that and let me know when you're ready.

4         A.    Is this gonna be the very top of the email

5    or at the very bottom?

6         Q.    "Last" was confusing.  I should have said

7    the very bottom.

8         A.    And is it addressed to Ted and Adrian?

9         Q.    It is.

10        A.    "Thanks for hopping on with Fernando and I

11   this afternoon"?  That one?

12        Q.    Yes.

13        A.    Okay.  Okay, I've read it.

14        Q.    Thank you.  Do you see there's a reference

15   to DNC/screamers?

16        A.    Let me see.  Okay, yeah, I see the

17   reference to it.

18        Q.    Do you understand what that reference is

19   as it relates to the Clear Link/DMS relationship?

20        A.    So, again, there's context with this.

21   Would you like the context?

22        Q.    I think first let's start with if you

23   understand what the "DNC/screamer" is referring to.

24        A.    I've never heard of the term "screamers."

25   I don't know if that's a typo.  It's possible that



Page 58

1    there are screeners or -- or -- but I've never heard

2    of screamers.  So I don't know what that is.  DNC

3    would be Do Not Call.  And DNQ would be -- I

4    interpret that as Does Not Qualify, but I don't know

5    what his reference is as to that.

6        Q.    Understood.  I'm -- so then did -- when

7    DMS and Clearlink had a warm transfer relationship,

8    did DMS send weekly Do Not Call requests?

9                MR. NATE:  Objection.  Form.

10               Go ahead.

11               THE WITNESS:  I don't recall.

12       Q.    BY MR. PARONICH:  It also says:  CL target

13   CPA is $400 to $600.

14               Did I read that correctly?

15       A.    Yes.

16       Q.    And is it your understanding that CL is

17   referring to Clearlink?

18       A.    Yes.

19       Q.    Can you explain to me how CPA is

20   calculated?

21       A.    Cost divided by sales.

22       Q.    And here, is that -- so then, can you

23   break down for me what that sentence means in that

24   context, "CL target CPA is $400 to 600"?

25       A.    That says to me that DMS understands what



Page 59

1    Clear Link's goals are to -- to target a 400- to
2    600-dollar CPA.  So they know that in order for the
3    campaign to be long-lasting and to be viable, we need
4    to -- to see that on our end.
5         Q.    And how does Clearlink calculate that on
6    their end, in terms of -- I understand that the cost
7    would be what the cost of the transfer is, but what's
8    the other -- what's the other formula in the
9    analysis?
10              MR. NATE:  Objection.  Form.
11              Go ahead.
12              THE WITNESS:  Sales.  So Clearlink can see
13   how many calls DMS is sending us and then Clearlink
14   can also see how many sales we've made from the calls
15   sent by DMS.  So we take what is our cost divided by
16   what is our sales.  That's our C --
17        Q.    BY MR. PARONICH:  Yeah.  And so for every
18   Medicare supplemental insurance policy, is there a
19   value known right away, in terms of what the sale is?
20        A.    The value of the sale?
21        Q.    Yes.
22        A.    No.  In Medicare it's very vague and
23   arbitrary.
24        Q.    So then, how does Clearlink assign a
25   dollar amount to it in order to calculate the CPA?



Page 60

```
 1                MR. NATE:  Objection.  Form.

 2                THE WITNESS:  We do our very best guess.

 3        Q.    BY MR. PARONICH:  Got it.  So then, our

 4   Exhibit 4 is going to be 10318.  Would you let me

 5   know when you have that document in front of you?

 6        A.    I got it.

 7        Q.    And this looks different than a standard

 8   email thread.  So do you recognize, kind of, the

 9   format of this document?

10        A.    I don't recognize this, no.

11        Q.    Okay.  Do Clearlink agents have the

12   ability to send messages to each other?

13                MR. NATE:  Objection.  Form.

14                THE WITNESS:  Yes.  Clearlink agents can

15   send messages.

16        Q.    BY MR. PARONICH:  Okay.  So on Page 2

17   there's a message from Sean Murley at 7/21/2020,

18   11:51:07.

19        A.    Okay.

20        Q.    It says:  It's not showing up in

21   backoffice.

22                Do you see that?

23        A.    I do see that.  It's kind of -- the word

24   "not" is there.  I see a "and" sign and a number sign

25   but -- and a 39, but I'll take your word for it.
```



Page 61

1       Q.     Yeah.  And so do you understand the
2   reference to "backoffice" there?
3       A.     I -- my interpretation of back office
4   would be our ops or our telophony team.
5       Q.     And are those the licensed agents that
6   handle the warm transfers?
7       A.     No.  Back office would be our operations
8   team, not our sales team.
9       Q.     Okay.  Got it.  Thanks for that
10  explanation.
11              So then Exhibit 5 would be 11298.
12      A.     Okay.  I've got it.
13      Q.     On Page 2 of the PDF, there is a reference
14  to a "pause."  Can you let me know when you see that
15  and have read that email?
16      A.     Does it start with, "Hey Neal, that's
17  definitely not the direction"?  Is it that one?
18      Q.     No.  It starts with, "Hi Mike - Zero
19  policies sold yesterday."
20      A.     I'm not on the same -- give me one second.
21      Q.     It's the second page of the four-page PDF.
22      A.     Okay.  I'm having --
23              MR. NATE:  11298.  That document, Neal.
24              THE WITNESS:  I'm having a slight internet
25  issue.  I just need to reload.  Give me just



Page 62

1    15 seconds, if you don't mind.

2        Q.    BY MR. PARONICH:  Not at all.  Take your

3    time.

4        A.    Okay.  Can I get the number again of the

5    exhibit?

6        Q.    Of course.  Yeah, so the -- the Bates

7    number is 11298.

8        A.    Okay.

9        Q.    And I'm currently on Page 2 of that PDF.

10       A.    Okay.  Okay, I'm with you.  "Hi Mike -

11   Zero policies sold yesterday.  We can let the

12   campaign run through today and then we'll need to

13   pause since the traffic isn't working for us."  Is

14   that the one?

15       Q.    It is.  And that was sent in January of

16   2020, correct?

17       A.    That's correct.

18       Q.    Was DMS ever paused on a campaign, prior

19   to Clear Link's termination of them?

20       A.    I would imagine so, but I don't recall.

21   Campaigns -- it's not uncommon to pause and then

22   unpause campaigns.  It happens quite frequently.

23       Q.    Okay.  Is DMS currently terminated or have

24   they been paused?

25       A.    Paused.

1      Q.    Okay.  And so any reference earlier to a

2   termination, would that have been -- would that be

3   entirely accurate or -- or not?

4      A.    I don't recall using the term

5   "termination."  I -- I mean, I typically don't use

6   the word termination because it's possible that

7   traffic could be better at a later time.  And so I

8   typically like to use the term "pause."

9      Q.    Understood.  Was Aragon terminated or

10  paused?

11     A.    I would use the word paused.  If they used

12  the word terminated, it's possible.  But even if --

13  even if one was terminated, that doesn't necessarily

14  end a relationship forever.

15     Q.    Has Clearlink ever terminated a

16  relationship with an affiliate partner and then

17  resumed that relationship at a later time?

18     A.    Well, it depends on if -- how you define

19  "terminated."  If you terminate and start again, I

20  guess that's called a pause as well.  So I don't know

21  how to answer that.

22     Q.    That's a fair point.  So let me ask a

23  slightly different question.

24            When two parties have a contractual

25  relationship, sometimes the contract can call for a



Page 64

1    process for terminating that relationship and then

2    notice is sent pursuant to the contract.  So I'll

3    start with the question, are you aware of Clearlink

4    ever sending a notice pursuant to a contract that a

5    company is no longer going to be working with

6    Clearlink?

7            MR. NATE:  Objection.  Form.

8            Go ahead.

9            THE WITNESS:  No, not that I'm aware of.

10   Q.    BY MR. PARONICH:  Okay.  Our next exhibit,

11   which will be 6, is going to be 13214.  You'll have

12   to scroll down a little bit to get it.

13   A.    Okay.  I've got it.

14   Q.    And this document references the DMS

15   exchange.  Do you see that?

16   A.    Am I starting at the top?  Oh, yeah.  Just

17   one page, right?

18   Q.    You are correct, there's just one page.

19   It's actually just one email.

20   A.    Okay.

21   Q.    And let me know when you've had a chance

22   to read it and I'll ask you a couple questions.

23   A.    Go ahead.

24   Q.    So are you familiar with the DMS exchange?

25   A.    I'm not familiar with the DMS exchange.



Page 65

```
1        Q.    Okay.  So then, do you know if Clearlink
2   has ever purchased any leads from the DMS exchange?
3        A.    Not to my knowledge.
4        Q.    Understood.  Exhibit 7 will be 13286.
5   Could you open that, please.
6        A.    Got it.
7        Q.    So there are a series of emails here, but
8   my question's just gonna relate to the one at the
9   very top, which is an email from you to Courtney
10  Walsh.  Feel free to --
11             MR. ASNEN:  Can you repeat which document
12  we're on?
13             MR. PARONICH:  Yes.  13286.
14             THE WITNESS:  I have it.  I'm ready.
15       Q.    BY MR. PARONICH:  So at the top email
16  there's references to a HIPAA violation, correct?
17       A.    Yes.
18       Q.    So can you explain to me what happened
19  in -- that led do you sending this email?
20       A.    Yes.  This is in reference to a
21  transferring agent.  So when DMS makes an outbound
22  dial to a potential -- a completed form fill, they
23  have the customer on the line, and what they're
24  supposed to do is transfer the call to Clearlink
25  after they've made a brief introduction.  And in this
```



Page 66

1    case, it looks like the transferring agent from DMS

2    is staying on the line after the call has been

3    transferred, and that is a HIPAA violation.

4         Q.    Got it.  And here you had mentioned that

5    such conduct puts Clearlink at risk, correct?

6         A.    Correct.

7         Q.    And that was after Clearlink had

8    investigated and found that there was approximately

9    33 such occurrences?

10        A.    Correct.

11        Q.    And so did Clearlink take any actions to

12   pause or end the DMS relationship as a result of what

13   you identified as approximately 33 HIPAA violations?

14        A.    So I would have to look at -- I mean, I'm

15   looking at the date, March of 2022.  I don't know the

16   context as to what happened shortly after that or

17   if -- if this campaign had just launched again.  As I

18   said, it is not uncommon to pause and unpause

19   regularly.

20        Q.    And so do you know if Clear -- if DMS was

21   paused as a result of this alleged HIPAA violation?

22        A.    I don't know.

23        Q.    Okay.  I will then -- our next exhibit

24   will be 13594, which is the last one.

25        A.    13594.



Page 67

1              COURT REPORTER:  And name that exhibit for

2    me.

3              MR. NATE:  We're on 8 now.

4              MR. PARONICH:  I'll take your word for it.

5         Q.   BY MR. PARONICH:  So, Mr. Chipping, this

6    is Exhibit 8, which is an October 2022 email between

7    Clearlink and DMS.  Do you see that?

8         A.   I do.

9         Q.   So is it fair to say that at least with

10   respect to this email, seven months after the HIPAA

11   violations had been identified, Clearlink and DMS

12   potentially continued their relationship?

13        A.   There -- that's not entirely true.

14        Q.   Explain to me how it's not true.

15        A.   Okay, so do you see "PX" in this email?

16        Q.   I do.

17        A.   I think we -- part of my testimony

18   previously was PX was heavily involved in the

19   Clearlink Medicare business October of 2022 through

20   all of AEP last year.

21        Q.   Yep.

22        A.   And so there would be a separate contract

23   between PX and DMS.  If DMS chose to send calls to

24   Clearlink, it would have been via PX.  And Clearlink

25   actually had very little to say as to which partners



Page 68

1    we received volume from.  Clearlink signed a contract

2    with PX to -- to take the volume, to vet it, to clean

3    it, to scrub it, and then to send it to us.  So if PX

4    chose to work with DMS, I would say that PX made that

5    decision, not Clearlink.

6          Q.    Understood.  But are you saying, under

7    your understanding of Clear Link's contract with PX,

8    Clearlink couldn't say, "We've had a relationship

9    with this company, we're currently in a nationwide

10   class-action lawsuit as a result in part of that

11   relationship, and we identified 33 HIPAA violations

12   they committed, and -- but Clearlink couldn't refuse

13   the traffic"?

14             MR. NATE:  Object to form.

15             THE WITNESS:  Clearlink did not have

16   insight to who -- which publishers and affiliate

17   partners that PX were using.

18         Q.    BY MR. PARONICH:  But Scott Allen --

19   scott.allen@clearlink.com is copied on this email,

20   correct?

21         A.    He is.

22         Q.    Okay.  And that email does say, "Adding

23   Sam here since she will be managing this campaign

24   with DMS this AEP."  Correct?

25         A.    Correct.



Page 69

1          Q.    Okay.

2                MR. PARONICH:  Well, then, Mr. Chipping, I

3      don't have any further questions right now.  But how

4      this works is your own counsel or Mr. Asnen may have

5      some questions.  If they do, it's typical for me then

6      to ask some further questions.  But I thank you for

7      your time today.

8                THE WITNESS:  Okay.  Thank you.

9                MR. NATE:  I have no questions.

10               Neal, do you have any?

11               MR. ASNEN:  I do.  Just a handful.  I'm

12     not gonna take up too much of your time,

13     Mr. Chipping.

14                         EXAMINATION

15     BY MR. ASNEN:

16         Q.    Just to get formalities out of the way, my

17     name's Neal Asnen.  I'm an attorney representing

18     Digital Media Solutions in this lawsuit.  As I said,

19     I only have a couple of follow-up questions.

20               While we have Mr. Paronich's exhibits up

21     in front of you, can I ask you to take a look at

22     Exhibit 6 again?  This is Bates number 13214.  It's

23     Exhibit 6.

24         A.    I've got it.

25         Q.    Okay.  In this email, Nadiv Schorer --



Page 70

1   probably butchering that -- seems to make reference

2   to a phone call that you had with this individual; is

3   that correct?

4        A.    Correct.

5        Q.    Do you recall that phone call?

6        A.    Not specifically.  I know --

7        Q.    Do you have any reason -- do you have any

8   reason to believe that there was no phone call as

9   referenced in this email?

10       A.    I know Nadiv.  I believe there was a phone

11  call.

12       Q.    Okay.  And based on the contents of this

13  email, would it be your understanding that the nature

14  of that phone call was to discuss this DMS exchange?

15       A.    Yes.

16       Q.    Okay.  And so you said that DMS exchange

17  was integrated on the Clearlink side.  Who within

18  Clearlink would have been involved with that?

19       A.    So this was March of -- March 28th of

20  2022, so I would have been the one onboarding with

21  Courtney and DMS.

22       Q.    Anybody else at Clearlink or just

23  yourself?

24       A.    If it's just regarding Medicare, it would

25  have just been myself.



Page 71

1      Q.    Are you aware of whether or not any of

2   your affiliate partners ever subcontract out the

3   dialing services that you hire them to do?

4      A.    I have heard that before.

5      Q.    Is that something that you would expect

6   the affiliate partners to provide notice to Clearlink

7   of, or is that something that they can do on their

8   own?

9      A.    I would prefer that they let us know, but

10  in that conversation I would ensure that our contract

11  is with DMS, and so if there would be any violations,

12  that it falls on DMS.  So again, we're putting the

13  onus on DMS if they choose to work with

14  subpublishers.

15     Q.    And I don't want to get into the -- kind

16  of the indemnity issues that you're alluding to.  I'm

17  just talking, kind of, about the division of labor in

18  terms of, you know, you may hire DMS to transfer your

19  calls, but is it possible that DMS then subcontracted

20  that dialing out to some other third party?

21     A.    Yes.

22     Q.    Okay.  I believe you had testified earlier

23  this morning about communicating internal DNC

24  information to your affiliate partners.  Do you

25  recall that?



Page 72

1          A.    Yes.

2          Q.    And I think you had testified that it was

3    you personally that would communicate, maybe, new

4    additions to the DNC list to your affiliates?  Is

5    that accurate?

6          A.    I would do my best to, yes.

7          Q.    Do you recall ever communicating to DMS

8    the plaintiff's information in this case, any

9    telephone numbers associated with Gerard Jackson?

10          A.    I mean, I don't specifically.  There were

11    hundreds of emails that were exchanged.  And so I'm

12    confident that Gerard Jackson's phone number was

13    placed on the DNC list as far reaching as Clearlink

14    could go.

15          Q.    And to the best of your personal

16    knowledge, were any calls to those numbers that you

17    communicated DNC requests subsequently transferred to

18    Clearlink by DMS?

19          A.    If I understand your question, are you

20    saying, did we contact that number after we had

21    said -- after we had placed it on the DNC list?

22          Q.    I apologize for a poorly-phrased question.

23                You testified that you believed you had

24    communicated to DMS Gerard Jackson's phone number as

25    just part of, kind of, DNC requests; is that right?



Page 73

1        A.    As far as I know, yes.

2        Q.    Okay.  Subsequent to that communication to

3    DMS, did DMS ever transfer calls to Clearlink

4    associated with either -- or any of those numbers of

5    Gerard Jackson's?

6        A.    Well, that's part of the entire

7    investigation, and I believe that there's some back

8    and forth on that.  So there was -- I was less

9    involved with that.  That's more on our ops team that

10   is able to pull call detail and which phone number

11   came through to us.

12       Q.    Fair enough.  Do you recall the context in

13   which you communicated to DMS the DNC request

14   associated with Gerard Jackson's telephone numbers?

15       A.    It's typically very brief.  We just send

16   an email and say, "This number needs to be added to

17   the DNC list.  Please add it to your records."

18       Q.    I guess my question's a little more

19   specific.  Do you remember why that request was made?

20       A.    Why?  Because there was a case being made

21   and, allegedly, Gerard Jackson did not want to be

22   contacted.

23       Q.    Was that the lawsuit that we're all here

24   today about, or was it a different claim?

25       A.    I don't know.



Page 74

1      Q.    Okay.

2            MR. ASNEN:  I don't believe I have any

3   further questions right now.  Thank you,

4   Mr. Chipping.

5            MR. PARONICH:  I actually don't have any

6   follow-up on that either.  So I think, Kennedy, if

7   you want to put on a read-and-sign, we'll be good to

8   go.

9            MR. NATE:  Yep.  We would like to request

10   to read and sign.

11            COURT REPORTER:  Mr. Asnen, are you

12   ordering a copy of the transcript?

13            MR. ASNEN:  Yes, please.

14            COURT REPORTER:  And Mr. Nate?

15            MR. NATE:  Yes, as well.

16            (The deposition concluded at 12:44 p.m.)

17

18

19

20

21

22

23

24

25



Page 75

```
 1                    CERTIFICATE OF DEPONENT
 2    PAGE  LINE     CHANGE                      REASON
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15                        *****
16       I, NEAL CHIPPING, deponent herein, do hereby
      certify and declare under penalty of perjury the
17    within and foregoing transcription to be my
      deposition in said action; that I have read,
18    corrected and do hereby affix my signature to said
      deposition.
19
20
21                            Deponent
22       Subscribed and sworn to before me this
      day of                    , 2023.
23
24
25
```

Notary Public



 1          I, KARINA PALMER, CCR #951, do hereby
    declare:

 2

 3          That, prior to being examined, the witness
    named in the foregoing deposition was by me duly
    sworn pursuant to Section 30(f)(1) of the Federal

 4  Rules of Civil Procedure and the deposition is a true
    record of the testimony given by the witness.

 5

 6          That said deposition was taken down by me
    in shorthand at the time and place therein named and
    thereafter reduced to text under my direction.

 7

    __X__   That the witness was requested to review the
 8          transcript and make any changes to the
            transcript as a result of that review
 9          pursuant to Section 30(e) of the Federal
            Rules of Civil Procedure.
10

    _____   Signature is Waived
11

    _____   The changes made by the witness are appended
12          to the transcript.

13  _____   No request was made that the transcript be
            reviewed pursuant to Section 30(e) of the
14          Federal Rules of Civil Procedure.  I further
            declare that I have no interest in the event
15          or the action.  I declare under penalty of
            perjury under the laws of the United States
16          of America that the foregoing is true and
            correct.

17

18          Witness my hand this 15th day of
            August, 2023.

19

20          _____
            KARINA PALMER, CCR #951

21

22

23

24

25



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**A-L-E-C**
43:20,21
**a.m**
1:15 45:2,2
**Abby**
55:14,22 56:3
**ability**
7:14 21:17 60:12
**able**
6:5 18:18 20:6,14,19
21:12 48:9 50:25
73:10
**accepted**
18:20
**accurate**
63:3 72:5
**acquired**
53:20 54:7
**acquisition**
7:15,16
**acronym**
25:16
**action**
4:11 75:17 76:15
**actions**
66:11
**actively**
29:6
**actual**
14:2 23:17
**add**
32:16,16 39:16 73:17
**added**
73:16
**Adding**
68:22
**additions**
72:4
**address**
14:12
**addressed**
57:8
**adhere**
15:16

**adhering**
14:18
**adjust**
16:7,11,13,15
**administered**
4:4
**Adrian**
57:8
**Advertising**
41:5,8,16,22
**advised**
30:10
**AEP**
36:4,8,11,15 37:2
67:20 68:24
**affiliate**
7:11,25 8:21,24 9:3,6
9:12,18 10:12,13,17
10:19,21,24 11:18
12:1,17,23 15:9,14
18:16,21 21:11,22
22:20 23:15,20,23
23:25 24:14,17 25:1
25:4 26:3 27:18
28:11,15,18 29:8,12
33:11,12,15 37:7,22
38:13,15 39:22 40:7
41:19,20,23 45:16
45:16,20 47:19,21
48:6,13,15 49:2,3
49:12,25 50:3,9,16
50:18,22,24 51:3,11
51:18 63:16 68:16
71:2,6,24
**affiliates**
72:4
**affix**
75:18
**afternoon**
57:11
**Agency**
1:9 7:6
**agent**
18:15,19,20 65:21
66:1
**agents**

21:14 32:5 35:19
36:11 60:11,14 61:5
**aggregator**
42:22
**ago**
20:23 21:1 30:22
35:24 39:1,5
**agree**
42:8 47:16
**agreed**
36:11
**agreement**
13:24 14:12
**agreements**
37:17
**ahead**
17:1,22 24:6,8 28:2
29:5,25 30:9 32:13
33:4 34:19 35:23
36:19 45:18 46:12
47:11 50:5,11 58:10
59:11 64:8,23
**Alec**
43:19,25 44:3,3,10
**allegations**
48:20
**alleged**
66:21
**allegedly**
73:21
**Allen**
68:18
**allow**
6:18
**alluding**
71:16
**America**
76:16
**amount**
21:24 22:17 24:10
42:9 49:13 50:23
59:25
**analysis**
16:21 27:5 59:9
**Anderson**
43:4

**Andrewsen**
41:9 43:5,10,17
**annual**
36:4
**answer**
4:20 5:20 6:6,24 7:21
15:8 17:2,10,12,12
17:22 21:14,15,16
24:8 28:11 29:18
51:7 63:21
**answered**
9:2
**answering**
32:6
**answers**
5:11
**Anthony**
2:2 4:9
**anthony@paronic...**
2:5
**anticipate**
14:14
**Anybody**
70:22
**API**
8:3 18:11,13,15,18
18:22 19:2,4,9,16
20:15,19,24,25 21:2
31:6
**apologies**
24:6
**apologize**
72:22
**APPEARANCES**
2:1
**appearing**
1:16
**appended**
76:11
**apples**
35:6,7
**appropriate**
5:12
**approved**
18:21
**approximately**



66:8,13
**April**
54:14
**Aragon**
25:12,21 30:6,14,17
  30:21 41:5,8,15,22
  42:8,10,11 43:3,15
  44:13 63:9
**Aragon's**
43:22
**arbitrary**
59:23
**art**
7:21
**asked**
6:24 8:7 28:17 29:3
  29:21 40:24
**asking**
5:18 6:10 9:6 32:21
  35:2 40:25 46:22
  55:1 56:25
**Asnen**
2:10 3:4 65:11 69:4
  69:11,15,17 74:2,11
  74:13
**assessment**
9:9
**assign**
59:24
**associated**
46:4 72:9 73:4,14
**assume**
34:7
**attend**
41:21
**attorney**
5:23 6:3 69:17
**attorney-client**
17:9
**attorneys**
4:10 6:12 38:5
**audible**
5:11
**audit**
50:2
**audits**

50:8
**August**
1:14 76:18
**auto**
39:2
**availability**
18:15
**available**
18:19,20 52:17
**Avenue**
2:12
**aware**
32:21 48:19,23 64:3
  64:9 71:1

---
**B**

**back**
9:5 14:22 17:18
  27:22 40:21 41:10
  61:3,7 73:7
**backoffice**
60:21 61:2
**barrier**
24:22
**based**
4:19 8:8 16:8 21:13
  21:19,21 22:6 35:7
  37:18 48:11 52:12
  70:12
**basically**
8:5 18:18 31:23
**Bates**
3:8,9,10,11,12,13,14
  3:15 52:18 62:6
  69:22
**began**
19:5 45:15
**begins**
19:6
**behalf**
1:5 14:17 15:2,6,10
**believe**
40:22 45:8 46:9 51:1
  53:1 54:16 70:8,10
  71:22 73:7 74:2
**believed**

72:23
**benefit**
10:18 43:14
**best**
5:11 7:14 15:22 16:2
  21:16,17 26:7,8
  39:17 60:2 72:6,15
**better**
16:15 63:7
**bid**
54:22
**big**
5:15
**bit**
7:18 16:7 20:6 31:2
  42:18 64:12
**book**
5:3,9
**bottom**
53:10 57:5,7
**brand**
20:5
**break**
6:21,25 44:19 58:23
**brief**
65:25 73:15
**broad**
14:2
**Brooklyn**
43:24 44:1,11
**business**
10:20 12:10 18:14
  19:13 48:1 50:17
  67:19
**butchering**
70:1
**button**
11:15
**buy**
56:17
**buyer**
55:6
**buys**
42:22

---
**C**

**C**
4:1 59:16
**C-O-L-E**
10:1
**calculate**
59:5,25
**calculated**
58:20
**call**
11:4,6,9,20,21 12:5
  12:17,20 18:16,17
  18:22 22:20 23:4,6
  23:8,23 24:1,11,20
  24:24 25:1 26:8,11
  29:10,10,13,15,15
  29:16 32:7,11,15,16
  33:2,8 35:17,21
  36:17 37:4 39:8,10
  46:3 47:18,22 48:12
  48:13 49:3 52:18
  55:4 58:3,8 63:25
  65:24 66:2 70:2,5,8
  70:11,14 73:10
**called**
19:25 20:1 39:19
  41:4 45:4 63:20
**caller**
48:15
**calling**
15:10 16:18,19 31:10
  47:7 48:20 49:7
  50:3,15 51:10
**calls**
7:12,14 9:2 10:22,24
  11:1,3,20 12:13
  13:7,8,25 14:13,17
  15:2,3,4,6,15 19:10
  21:15 26:4,6 29:7
  31:16,21 32:6 35:1
  35:6,20 36:15,16,23
  36:25 37:2 38:16
  42:7 46:3 56:18
  59:13,14 67:23
  71:19 72:16 73:3
**Camhe**
40:14,16



MAGNA
LEGAL SERVICES

**campaign**
16:8 28:4 30:11 59:3
    62:12,18 66:17
    68:23
**campaigns**
62:21,22
**captures**
27:20
**capturing**
27:2,23
**case**
30:11,24 31:1 38:8
    40:23 53:3 66:1
    72:8 73:20
**cases**
28:21
**cause**
17:5 26:7 29:14
    48:17 54:10
**caveat**
6:23
**CCR**
1:19 76:1,20
**cell**
37:12,12
**center**
22:20 23:23 24:20
**Centerfield**
33:24 34:1,3
**centers**
24:1,11,24 25:2 26:8
    26:12 37:4
**CEO**
43:13,15
**certain**
16:18 17:24 22:17
**CERTIFICATE**
75:1
**Certified**
1:21
**certify**
75:16
**chain**
40:20
**chance**
56:23 64:21

**Chandler**
41:9
**change**
37:17 75:2
**changed**
50:18
**changes**
76:8,11
**channel**
42:19
**charge**
45:13
**charges**
51:2
**check**
24:3
**Chipping**
1:8 3:2 4:3,9 7:4 17:5
    18:2 25:16 37:6
    39:18 41:11 45:3
    52:16 67:5 69:2,13
    74:4 75:16
**choose**
71:13
**chose**
67:23 68:4
**chronological**
53:8
**circling**
9:5 41:10
**City**
2:8
**Civil**
1:5 76:4,9,14
**CL**
58:12,16,24
**claim**
73:24
**claims**
49:7 50:14,23
**clarifying**
28:11
**class-action**
68:10
**clean**
68:2

**clear**
1:9 2:15 5:19 10:19
    20:14 29:16 39:22
    45:23 48:1 57:19
    59:1 62:19 66:20
    68:7
**Clearlink**
2:7 7:6,10 8:18,19
    10:5,25 11:10,11,19
    11:21 12:1,7 13:10
    14:5,18 15:2,3,5,7,8
    15:10,16 16:21
    18:14,17 19:19 21:5
    21:7 23:4,14 24:3,4
    24:12 26:12,17,22
    27:13,24 28:6,13,17
    28:23 29:1,13,19
    30:2 32:3,9,21,25
    33:6,7,10,12,17
    34:11 35:19,19 36:7
    36:9,15,23 37:2
    38:21 39:7 40:8,11
    41:23 42:13,24
    45:14 46:16,22 47:9
    48:9,19,21,22,23
    49:1,6,11 50:1,14
    50:17 51:9 53:4,13
    53:16,23 55:6,23
    58:7,17 59:5,12,13
    59:24 60:11,14
    63:15 64:3,6 65:1
    65:24 66:5,7,11
    67:7,11,19,24,24
    68:1,5,8,12,15
    70:17,18,22 71:6
    72:13,18 73:3
**code**
16:14 47:18 48:2
**codes**
14:15 16:15
**collected**
49:13 50:15
**come**
25:13,24 26:1 44:20
**comes**
29:16 32:22

**coming**
32:10
**committed**
68:12
**communicate**
21:6 24:13,14,25
    25:5 37:6,21 39:12
    39:17 72:3
**communicated**
24:17 72:17,24 73:13
**communicating**
71:23 72:7
**communication**
37:8 40:21 73:2
**communications**
37:15 38:4,7
**companies**
42:24,24 46:22,25
**company**
37:24 39:19 41:4,5
    42:6,22 43:22 45:4
    64:5 68:9
**compared**
35:3
**comparison**
35:7
**complained**
48:11
**complaint**
28:14 29:9 47:23
    51:10
**complaints**
46:3 47:7,14,15
    48:18
**completed**
27:17 65:22
**compliance**
27:3,5,12 42:15 43:3
    43:8
**comprehensive**
25:9
**concluded**
74:16
**conclusion**
25:24
**conduct**



66:5
**conference**
41:21 45:19
**confident**
44:2,7,11 72:12
**confused**
42:18
**confusing**
57:6
**consent**
11:15,16
**consumer**
11:20 27:1 32:23
**contact**
39:15,25 40:4,12,15
41:7 72:20
**contacted**
11:16 36:11 47:16
73:22
**content**
26:18
**contents**
70:12
**context**
48:24 49:5 54:19
57:20,21 58:24
66:16 73:12
**contextualize**
5:4
**continue**
15:24 45:24 51:2
**continued**
67:12
**contract**
12:6,9,18,19,21 13:5
13:14,16,22 14:1,3
19:7 23:15 31:3
63:25 64:2,4 67:22
68:1,7 71:10
**contractual**
63:24
**conversation**
5:7,15 6:15 16:12
50:21,21 71:10
**conversations**
6:11 40:18 41:1

**conversion**
16:13
**coordinator**
10:12
**coordinators**
10:13
**copied**
68:19
**copy**
74:12
**correct**
7:19 12:16 15:17
21:4 23:12,23 27:13
27:14 30:18 31:4,7
31:8,11 32:23 37:5
39:19 42:16 43:16
44:8,10 49:8,14
53:14,15 54:8 62:16
62:17 64:18 65:16
66:5,6,10 68:20,24
68:25 70:3,4 76:16
**corrected**
75:18
**correctly**
58:14
**cost**
7:15,16 58:21 59:6,7
59:15
**counsel**
2:15 27:7 40:21
50:25 69:4
**counsel's**
51:23
**count**
21:14
**couple**
10:17 64:22 69:19
**course**
12:22 53:13 56:9
62:6
**court**
1:1 4:22 5:2,9,25
14:23 17:20 51:4
67:1 74:11,14
**Courtney**
40:14 65:9 70:21

**CPA**
7:18 22:6,8 58:13,19
58:24 59:2,25
**creating**
5:2,9 9:9
**Crisp**
53:17,20,23 54:3,7
**criteria**
23:3 51:23,23
**CRM**
19:13,15,19
**current**
7:7 8:24 16:22 18:3
**currently**
7:4 11:25 18:4 31:6
33:13,20 34:16
55:18,21 62:9,23
68:9
**customer**
11:13,20 22:24 23:3
23:20 24:19,22
28:14 35:25 36:1
47:15 65:23
**customer's**
48:15
**customers**
15:15 36:4,7 37:1

────────────────
        **D**
────────────────
**D**
4:1
**data**
16:7,9 20:7 55:3,3
56:16,17
**date**
66:15
**day**
14:13 21:9,11,25
45:25 75:22 76:18
**deal**
5:15
**decide**
52:12
**decided**
51:12
**decision**

42:14 68:5
**declare**
75:16 76:1,14,15
**Defendant**
1:11 2:6,10
**define**
63:18
**definitely**
61:17
**depends**
63:18
**deponent**
75:1,16,21
**deposition**
1:7 4:12 5:1 6:21
74:16 75:17,18 76:3
76:4,5
**depositions**
17:7
**DESCRIPTION**
3:7
**designed**
6:14
**desire**
25:1
**detail**
73:10
**determination**
16:10 21:10,19 22:16
51:16
**determine**
15:19 22:2,9,12 48:9
**dial**
22:22,23 23:9 36:4,7
65:22
**dialing**
11:18 71:3,20
**dials**
56:17
**differences**
20:2
**different**
5:24 12:10,12,19,21
12:25 13:1 16:19
32:20 34:25 36:14
38:25 42:23 53:24



54:2 55:4,24 60:7
63:23 73:24
**differently**
11:10 35:9
**Digital**
1:9 2:11 25:12,17
69:18
**direct**
23:9 34:6 45:4,6,24
46:4,8 54:22
**direction**
61:17 76:6
**directly**
9:1,23 10:6 11:20
21:8
**director**
7:8 55:16 56:4
**discovery**
38:7
**discuss**
43:9,18 70:14
**discussed**
37:3
**Discussion**
52:15
**distinction**
11:23
**DISTRICT**
1:1,2
**divided**
58:21 59:15
**division**
71:17
**DMS**
25:17,21 26:11 30:6
30:7,12,15 34:10
35:2,5,10 39:19,21
40:1,5,7,11,14,18
41:1,10,12 47:3
49:23 53:14,20,24
54:3,7 58:7,8,25
59:13,15 62:18,23
64:14,24,25 65:2,21
66:1,12,20 67:7,11
67:23,23 68:4,24
70:14,16,21 71:11

71:12,13,18,19 72:7
72:18,24 73:3,3,13
**DNC**
58:2 71:23 72:4,13
72:17,21,25 73:13
73:17
**DNC/screamer**
57:23
**DNC/screamers**
57:15
**DNQ**
58:3
**document**
7:17 8:9 54:13 55:8,9
60:5,9 61:23 64:14
65:11
**documents**
48:1 52:17
**doing**
5:2 8:10,16 12:24
33:13,16 56:1
**dollar**
50:23 59:25
**Downing**
10:9 38:10,12
**Downing's**
10:10
**dozen**
12:2,23 18:2,5
**due**
42:1
**duly**
76:3

───────────────
E
───────────────
**E**
4:1,1
**earlier**
18:2,10 31:25 35:16
41:25 63:1 71:22
**easiest**
52:5 54:11
**Eastern**
44:25
**efficiently**
4:17

**either**
27:19 28:4 34:17
45:19 56:18 73:4
74:6
**electronically**
52:17
**eligible**
36:1,2,12 38:19
**email**
37:8,10,16,19 40:20
40:23 45:22 53:2,5
54:14,20 55:13,13
56:5,8,11,14 57:1,4
60:8 61:15 64:19
65:9,15,19 67:6,10
67:15 68:19,22
69:25 70:9,13 73:16
**emails**
40:22 65:7 72:11
**EMPIRE**
1:10
**employed**
7:5 8:18,19
**employees**
10:5 40:18 41:1
**engage**
50:2
**engaged**
12:10 26:22
**engages**
16:22
**enrollment**
35:3,5 36:1,3,4
**ensure**
29:20 71:10
**entire**
52:13 73:6
**entirely**
63:3 67:13
**entrusted**
29:7
**especially**
5:17
**Esq**
2:6,10,11,15
**event**

29:9 76:14
**everyone's**
21:17
**exactly**
53:11
**Examination**
3:1,3,4 4:7 69:14
**examined**
4:4 76:2
**example**
5:6 24:16
**exchange**
64:15,24,25 65:2
70:14,16
**exchanged**
72:11
**exclusive**
54:18,22 55:2,5
**excuse**
21:23
**exhibit**
3:8,9,10,11,12,13,14
3:15 52:23 55:9
56:22 60:4 61:11
62:5 64:10 65:4
66:23 67:1,6 69:22
69:23
**exhibits**
3:6,7 52:2,10,12
69:20
**exist**
37:15
**existing**
45:7
**expect**
14:14 71:5
**expensive**
51:5
**experience**
11:7 13:20 21:20,21
24:19,22 51:3
**explain**
5:1 7:9,22 10:19 11:9
18:13 20:2 42:17
54:17 56:1,12 58:19
65:18 67:14



**explained**
34:16
**explaining**
4:25
**explanation**
11:24 12:15 31:13
    61:10

---
### F
**fair**
9:9 20:22 35:13 39:4
    40:3 63:22 67:9
    73:12
**falls**
71:12
**familiar**
19:12 41:4 45:4 46:2
    46:7 64:24,25
**far**
7:25 34:12 72:13
    73:1
**Federal**
76:3,9,14
**feel**
6:9 65:10
**Fernando**
57:10
**field**
21:20,21
**fight**
51:13
**file**
1:5 27:10 51:2
**filed**
31:1
**filing**
30:24
**fill**
11:13,14 26:14 65:22
**find**
47:19
**findings**
9:11
**finish**
44:20
**firm**

50:2
**firms**
50:9
**first**
6:9 8:6,25 18:25
    19:25 29:14 34:4
    55:13 56:5 57:22
**five**
35:14 40:9
**five-**
48:3
**Floor**
2:12
**fluctuate**
18:4
**fluctuation**
18:6
**Fluent**
34:2,4
**focus**
26:4
**foggy**
46:10
**follow**
23:1,2
**follow-up**
36:15 69:19 74:6
**followed**
25:22 26:2
**follows**
4:5
**foregoing**
75:17 76:3,16
**forever**
63:14
**forgot**
17:19
**form**
11:13 16:25 24:6
    26:14,19,25 27:19
    27:25 28:1,5,7,16
    29:4,24 30:8 32:12
    33:3 34:18 35:22
    36:18 45:17 50:4,10
    50:19 51:20 56:7
    58:9 59:10 60:1,13

    64:7 65:22 68:14
**form-fill**
22:23
**formalities**
69:16
**format**
60:9
**former**
55:16
**formula**
21:18 59:8
**forth**
40:21 73:8
**found**
66:8
**Foundation**
24:5 47:10
**four**
31:19 41:24
**four-page**
61:21
**fourth**
34:8
**frame**
56:1
**free**
65:10
**frequently**
37:17 62:22
**front**
60:5 69:21
**funnel**
42:23,25
**further**
69:3,6 74:3 76:14

---
### G
**G**
4:1
**general**
17:11 40:20 51:23
**generally**
9:8 12:11 16:3 27:6
    44:15 46:19
**generate**
8:14 10:25 15:15

31:22,24 33:16
    35:25 37:1
**generated**
39:22
**generating**
8:1,13 33:20
**geography**
13:24
**geotargeting**
14:14 15:19 16:8,11
**Gerard**
1:5 72:9,12,24 73:5
    73:14,21
**getting**
22:25 24:7 42:12
**gist**
43:1
**give**
5:11 6:14 24:16
    52:13 61:20,25
**given**
17:5 76:4
**go**
4:15 7:20 11:13
    16:14 17:1,22 24:6
    24:8 28:2,14 29:5
    29:25 30:9 32:13
    33:4 34:19 35:23
    36:19 45:18 46:12
    47:11 50:5,11,23
    52:3,8,11 58:10
    59:11 64:8,23 72:14
    74:8
**goal**
9:7 38:18
**goals**
59:1
**going**
17:10 51:4 56:25
    60:4 64:5,11
**gonna**
4:18 12:25 17:17
    19:22 38:5 52:1,11
    54:9 56:21 57:4
    65:8 69:12
**good**



24:9 35:8 51:24
74:7
**grab**
52:6
**Granat**
2:11
**great**
5:14 6:18 24:21
44:23 53:2
**ground**
4:15
**guess**
8:25 13:3 29:18 32:8
42:18 60:2 63:20
73:18
**guessed**
45:12
**guys**
19:22

**H**

**Hac**
2:2
**halfway**
44:17
**hand**
76:18
**handful**
25:8,10 30:19 69:11
**handle**
61:6
**handling**
47:7
**Hansen**
2:15 6:16
**happen**
17:7 27:16 31:7
**happened**
37:23 49:17,19,23
53:22 65:18 66:16
**happens**
32:2 62:22
**happy**
14:20
**hard**
5:9

**head**
5:7 21:13
**hear**
38:3
**heard**
10:16 57:24 58:1
71:4
**heavily**
67:18
**held**
52:15
**help**
4:16 5:4
**helps**
5:4
**Hey**
54:21 61:16
**Hi**
61:18 62:10
**highest**
18:7
**Hingham**
2:4
**HIPAA**
65:16 66:3,13,21
67:10 68:11
**hire**
71:3,18
**hired**
50:1
**historically**
16:6 51:24
**hit**
11:14
**hitting**
11:15
**hold**
28:13
**holds**
28:12 55:17
**home**
39:2
**hopping**
57:10
**human**
5:15

**hundreds**
72:11

**I**

**ID**
48:16
**identified**
66:13 67:11 68:11
**identifies**
48:4
**imagine**
46:5 62:20
**in-house**
2:15 27:6 28:13
**inbound**
11:6,19 12:13 13:8
23:9 26:4,6 32:7
35:21 36:17 55:4
56:18
**include**
14:11
**included**
13:21,21 15:20 23:18
**incredibly**
6:20
**indemnification**
48:25
**indemnity**
71:16
**INDEX**
3:1,6
**indicator**
22:8
**indicators**
22:11
**individual**
10:8 70:2
**individually**
1:5
**individuals**
36:8 38:17 39:16
**information**
11:14 14:10 17:9
27:2 71:24 72:8
**initially**
16:5 51:21

**insight**
68:16
**instance**
51:9
**instances**
50:14
**instruct**
6:4 17:10 23:2
**instruction**
5:20 25:14,21,22
26:2
**instructions**
6:9 17:6
**instructs**
23:14
**insurance**
1:9 7:6 38:21 39:2
59:18
**integrated**
8:4 19:1,9 20:21,24
70:17
**integration**
8:3 18:11,13,23 19:5
19:16 20:25 21:2
31:6
**intended**
38:3
**interaction**
40:15
**interest**
76:14
**interested**
22:25
**internal**
39:7,10 71:23
**internally**
8:4 32:16
**internet**
61:24
**interpret**
55:3 58:4
**interpretation**
56:15 61:3
**interrupt**
5:16 15:23
**interview**
71:23



interviewing
9:12
introduce
52:2
introduced
45:22
introduction
45:20 65:25
investigated
66:8
investigating
47:14
investigation
73:7
involved
44:14 46:16,19,25
47:6 67:18 70:18
73:9
involvement
46:7
IO
13:14,16,18,21,23
14:3,11,16 15:20
16:22 23:16,18,21
31:9
IOs
13:11 14:5,7 15:13
Island
44:3,7
issue
61:25
issues
42:15 43:3,8 71:16

**J**

Jackson
1:5 72:9 73:21
Jackson's
72:12,24 73:5,14
January
62:15
Jason
9:25
Jeremy
2:15
job

7:12,23 13:10 14:4
47:8
Jornaya
27:19,25 28:5,7
51:19
judge
6:1
July
55:25
jump
56:21

**K**

K-O-L
10:2
Karina
1:19 76:1,20
Kattie
55:1
Keep
29:12
keeps
5:18
Kennedy
2:6 74:6
kept
54:6
kind
4:16 5:9 8:9,13 16:9
60:8,23 71:15,17
72:25
KLEIN
2:11
knate@rqn.com
2:9
know
5:6,14,17 8:12 9:8
10:3,10 11:25 12:23
15:1,9 17:5 18:9
19:4 25:8 27:8,22
29:14 30:23,25,25
32:6,15,17,18 33:9
33:25 34:5,8 38:12
43:22,25 44:4,9
45:9 46:11,13 48:24
49:15,19,21 50:6,7

50:12 52:20,24 53:4
53:6,8 55:10 56:9
56:22 57:3,25 58:2
58:4 59:2 60:5
61:14 63:20 64:21
65:1 66:15,20,22
70:6,10 71:9,18
73:1,25
knowledge
13:19 28:21 36:24
38:14 65:3 72:16
known
59:19
knows
52:8
Kol
9:25 55:20
Kol's
10:3 14:8

**L**

labor
71:17
Lake
2:8
language
12:11 24:22
laptop
52:6
largely
21:13 42:21
launched
66:17
law
2:3 4:22 5:25 50:2,9
laws
76:15
lawsuit
46:16,19 47:8 49:22
68:10 69:18 73:23
lawsuits
46:8 47:1 52:19
lay
49:5
lead
7:8,9 11:12 18:8

26:25 27:1,13,15,21
27:23 31:17 36:22
48:10 49:13 51:22
55:3,3
LeadAmp
19:25 20:3,5,21 21:3
leads
8:2 10:25 22:17,22
27:9,25 33:16 42:23
42:25 53:23,24,25
54:18,21 55:2 56:6
56:13,16,17 65:2
LeadsCon
41:20 45:15,20
led
65:19
leg
29:10,15
legitimate
51:2
legs
44:19
let's
57:22
level
16:14
licensed
32:5 36:11 61:5
Lifetime
22:13,14
light
30:11
likes
49:1
limit
24:10 25:1
limitation
24:13,17
limitations
24:23
limited
42:9
Lincoln
2:3
line
65:23 66:2 75:2



**Link**
1:9 2:15
**Link's**
10:19 20:15 29:16
39:22 45:24 48:1
59:1 62:19 68:7
**Link/DMS**
57:19
**linked**
19:15
**list**
25:9 34:11 39:8,10
39:16 46:4 72:4,13
72:21 73:17
**listed**
32:11 33:1 46:9,15
46:15
**listen**
29:7
**listening**
29:21
**litigation**
40:19 41:2
**little**
16:7 20:6 31:2 32:20
42:18 44:18 46:10
64:12 67:25 73:18
**live**
29:6,21
**LLC**
1:9,10
**load**
52:9,9
**locate**
41:18
**located**
43:23 44:1 45:9
**lockdown**
54:22
**long**
6:20 8:17 40:7 41:22
44:3,7
**long-lasting**
59:3
**long-standing**
37:11

**longer**
5:19 55:22 64:5
**look**
15:21 16:12 17:23
47:17 66:14 69:21
**looked**
26:19
**Looker**
20:1,3,5,9,10,13,19
20:24 21:6
**looking**
14:1 16:9 53:7 66:15
**looks**
51:19 60:7 66:1
**lot**
17:6,7

---
**M**

**MA**
2:4
**main**
8:12 39:25 40:11
41:7
**majority**
18:22
**making**
15:2 16:10 29:13
31:20
**manage**
7:14 9:3
**managing**
68:23
**March**
66:15 70:19,19
**mark**
52:11
**marketing**
10:4 55:16 56:4
**mean**
11:11 15:23 16:2
22:6 25:17 36:8
46:15 48:25 51:6,19
53:8 63:5 66:14
72:10
**meaning**
14:13,14 24:20 26:5

**means**
54:18 55:5 58:23
**Media**
1:9 2:11 25:12,17
69:18
**Medicare**
22:25 34:24 36:2
38:18,19 55:23
59:18,22 67:19
70:24
**Medicare-eligible**
38:17
**meet**
7:24
**meeting**
45:15
**meets**
27:3,4 51:22
**memory**
46:10,14,18
**mention**
56:6
**mentioned**
7:21 23:13 26:14
66:4
**message**
60:17
**messages**
38:13 60:12,15
**messaging**
37:9,16,21
**met**
23:3
**MIDDLE**
1:2
**Mike**
55:14 61:18 62:10
**mind**
14:22 25:13 29:12
62:1
**Mine**
32:20
**misunderstanding**
55:18,19
**mitigate**
30:20

**mode**
37:8
**model**
18:14
**moment**
41:10
**money**
49:7,13 50:15,16
**months**
67:10
**morning**
71:23
**moved**
55:24
**MOYNIHAN**
2:11
**multiple**
24:1 26:8 40:4
**Murley**
60:17
**Myles**
55:14

---
**N**

**N**
4:1
**Nadiv**
69:25 70:10
**name**
10:10 14:12 19:23
25:7,8,10 33:21,25
38:10 42:6 43:5
67:1
**name's**
4:9 69:17
**named**
76:3,6
**names**
12:24
**nasnen@kleinmoy...**
2:14
**Nate**
2:6 6:11,15 16:25
17:21 24:5 28:1
29:4,24 30:8 32:12
33:3 34:18 35:22



36:18 44:23 45:17
47:10 50:4,10,19
52:5 58:9 59:10
60:1,13 61:23 64:7
67:3 68:14 69:9
74:9,14,15
**national**
33:1,7
**nationwide**
68:9
**nature**
70:13
**Neal**
1:8 3:2 4:3 52:6
54:21 61:16,23
69:10,17 75:16
**NEBEKER**
2:7
**necessarily**
8:10 51:1 63:13
**need**
14:7 20:10,18,23
39:16 59:3 61:25
62:12
**needs**
73:16
**Neil**
2:10
**Ness**
54:14
**never**
38:3 57:24 58:1
**new**
2:13 9:12,18 15:15
20:5,17,20 24:7
39:15 43:24 44:1,2
44:4,9 72:3
**nod**
5:7
**non-test**
27:25
**normal**
5:6
**notes**
9:20
**notice**

64:2,4 71:6
**number**
7:11 8:11,17 18:4
23:7 31:22,24 32:23
33:1 34:11 44:16
48:4,11 60:24 62:4
62:7 69:22 72:12,20
72:24 73:10,16
**numbers**
32:10 46:3 48:16
52:19 54:3,7,9,10
72:9,16 73:4,14
**NY**
2:13

---

## O

**O**
4:1
**oath**
4:4,19,21
**object**
5:23 68:14
**objection**
16:25 17:21 24:5
28:1 29:4,24 30:8
32:12 33:3 34:18
35:22 36:18 45:17
47:10 50:4,10,19
58:9 59:10 60:1,13
64:7
**objections**
6:2,2 17:7
**objects**
6:4
**obviously**
32:22 50:20
**Occasionally**
37:10
**occur**
31:15
**occurred**
49:16 50:8
**occurrences**
66:9
**October**
67:6,19

**offhand**
34:5
**office**
61:3,7
**offshore**
24:20,23 25:1 26:9
26:11
**oftentimes**
50:22
**Oh**
15:23 24:5 43:6 48:3
55:20 56:3 64:16
**okay**
4:15 5:14 6:8 7:3
11:23 12:14 13:20
15:4 16:1 18:10
20:13,17 21:5 22:11
22:15 23:5,13 25:20
30:17 31:2 34:7
35:15 36:25 37:24
38:12,15 43:6 44:9
44:13,22 46:2,18
47:13 49:15,25 50:7
51:8,15 52:16,22
53:2,12,19 54:12
55:20 56:11 57:13
57:13,16 60:11,16
60:19 61:9,12,22
62:4,8,10,10,23
63:1 64:10,13,20
65:1 66:23 67:15
68:22 69:1,8,25
70:12,16 71:22 73:2
74:1
**older**
20:6
**oldest**
57:2
**onboard**
7:11 16:5 26:23 45:6
**onboarded**
45:8 47:5
**onboarding**
7:22 8:5 9:6 19:6
26:24 31:3 39:14
41:11,15 46:21,24

51:21 70:20
**once**
16:7 52:9
**one-off**
39:13
**ones**
52:12
**online**
11:13,13 22:23 26:14
26:19
**onshore**
26:9,11
**onus**
49:2 71:13
**open**
35:2,4 36:1,3 52:20
65:5
**opened**
40:23
**operated**
55:5
**operations**
61:7
**opposed**
51:12
**opposing**
50:25
**ops**
47:17 61:4 73:9
**opt-in**
27:21 28:12,15,17
47:21,24 50:25
51:11,16
**optimization**
7:8,10 18:8 36:22
**optimize**
7:13
**oral**
40:25
**orally**
52:12
**order**
20:9,18 21:18 53:8
59:2,25
**ordering**
74:12



organization
45:21
originated
11:12,22 22:22 49:3
other's
42:9
outbound
11:18,21 22:21,23
29:13 35:20 36:3,7
36:16,25 56:17
65:21
outside
35:4,25
owned
55:5

**P**

P
4:1
P&C
39:1
P.C
2:3
p.m
54:15 74:16
page
3:2,7 54:10,13 60:16
61:13,21 62:9 64:17
64:18 75:2
paid
42:12 49:7
Paisley
10:9 55:17
Paisley's
38:10
Palmer
1:19 14:21 17:18
52:7 76:1,20
paper
53:6
paperwork
8:2 19:7
parameters
14:18 15:17
pardon
24:6

Paronich
2:2,3 3:3 4:8,9 14:21
15:4 17:4,17 18:1
24:9,12 28:6 29:17
30:2,12 32:19 33:6
34:22 36:6,21 44:17
44:24 45:3,23 47:13
50:7,13 52:1,7,16
58:12 59:17 60:3,16
62:2 64:10 65:13,15
67:4,5 68:18 69:2
74:5
Paronich's
69:20
parse
21:16
part
6:3 12:3 13:9 14:4
16:21 23:15,16
26:24 27:10,12
36:22 38:7 39:14
42:4 44:4,9 46:21
46:24 47:8 48:18
52:2 55:22,23 67:17
68:10 72:25 73:6
participate
26:17
participation
26:22
particular
16:8
parties
1:16 8:2 63:24
partner
7:24 8:7,12 9:13,19
10:19,21 11:18,18
12:18,19,20 13:5,13
15:9 16:3 18:16,21
19:1,8 20:9,18,20
20:22 21:11,23,23
22:16,20 23:10,20
23:23 24:15,18 25:1
25:4 26:3,23 27:18
28:12,15,18 29:8,12
30:3 31:15,20 33:19
33:21,25 40:7 41:14

41:19,23,23 45:7,10
47:19,21 48:10,13
48:15 49:2,3,12
50:16,18,22,24 51:3
51:11,18 63:16
partner's
24:1 50:3
partners
7:11 8:21,24 9:3,6
10:17,25 12:1,5,6
12:24 13:17 14:11
14:17 15:14 16:18
16:19,23 17:24 18:3
20:4 21:6 22:3
23:15 26:21 32:3
33:11,13,15 35:12
35:17,17 37:7,11,22
38:13,15 39:11,22
45:14 48:6 50:1,9
67:25 68:17 71:2,6
71:24
parts
42:5
party
37:3 50:1 71:20
password
20:11
pause
30:10 61:14 62:13,21
63:8,20 66:12,18
paused
62:18,24,25 63:10,11
66:21
PDF
54:10 61:13,21 62:9
penalty
75:16 76:15
PENNSYLVANIA
1:2
percent
44:12
perform
27:5
performance
15:21 22:9,12
performance-based

22:4,6
performed
38:6 50:8
performing
15:22 16:2,6,15
period
35:3,5 36:3,5,22
perjury
75:16 76:15
person's
5:18
personal
37:25 38:1 72:15
personally
40:17 72:3
phone
7:12,14 9:2 10:22,24
11:1,3,4,6,9,20 12:5
12:17,20 18:16
21:15 23:6 29:15
31:22,24 32:6,23
33:1 35:16 36:25
37:12,12,25,25 38:1
38:7 47:22 70:2,5,8
70:10,14 72:12,24
73:10
phones
21:15
phrase
42:19
physically
43:23 44:1
ping
18:18 20:19,24
pinging
20:14
place
27:1,13 29:1 31:10
31:17 76:6
placed
27:16 28:10 51:21
72:13,21
plaintiff
1:7 2:2 4:10
plaintiff's
72:8



**please**
15:24 25:10 52:24
   57:2 65:5 73:17
   74:13
**point**
20:22 35:8 39:25
   40:2,11 41:7 53:20
   63:22
**points**
40:4
**policies**
61:19 62:11
**policy**
59:18
**poorly-phrased**
72:22
**position**
41:14 55:20
**possible**
4:17 41:13 57:25
   63:6,12 71:19
**potential**
9:12,18 10:25 21:24
   24:4 37:1 41:18
   45:10 52:10 65:22
**potentially**
5:16 67:12
**practice**
9:19
**practices**
12:10 50:3
**precise**
40:25
**prefer**
71:9
**preferred**
37:7
**prepare**
14:7 15:14
**prepared**
8:9
**preparing**
14:5
**Present**
2:15
**President**

**10:4**
**pretty**
6:2 17:8
**previously**
46:8 67:18
**price**
13:24 14:13
**pricing**
12:25 48:7
**primarily**
19:24
**printed**
53:5,6
**prior**
44:14 49:22 50:13
   62:18 76:2
**private**
6:12
**privileged**
6:12 17:9
**Pro**
2:2
**probably**
44:16 70:1
**Procedure**
76:4,9,14
**process**
6:3 8:5 19:5 26:24,25
   27:12 31:3 46:21,25
   64:1
**processes**
29:1
**produced**
53:3
**Professional**
1:20
**profitable**
7:15
**promo**
47:18 48:2
**pronounced**
38:10
**proof**
28:12
**provide**
20:7 28:20 47:23

**50:25 51:18 71:6**
**provided**
28:24
**publishers**
68:16
**pull**
29:9 52:24 56:23
   73:10
**pulled**
55:11
**purchased**
65:2
**pursuant**
64:2,4 76:3,9,13
**put**
24:23 49:1 74:7
**puts**
66:5
**putting**
71:12
**PX**
42:7,7,8,9,21,22,25
   44:14 67:15,18,23
   67:24 68:2,3,4,7,17
**PX's**
42:17

Q

**Qualify**
58:4
**question**
6:5,10,24,25 9:16
   12:14 13:4 14:22
   15:12 17:13,16 18:7
   27:11 28:14 29:19
   31:13 32:20 34:8,23
   35:9 36:13 40:3,25
   47:3,22 57:1 63:23
   64:3 72:19,22
**question's**
65:8 73:18
**questioning**
38:3
**questions**
4:18 6:13 7:25 8:8
   9:5 18:25 20:8

**23:19,21 29:2,8,20**
   55:7 64:22 69:3,5,6
   69:9,19 74:3
**quick**
6:8
**quickly**
52:8
**QUINNEY**
2:7
**quite**
7:17 62:22

R

**R**
4:1
**rank**
44:15
**rare**
17:8
**RAY**
2:7
**reach**
47:20 51:17
**reaching**
72:13
**read**
5:3 14:24 17:18 56:8
   56:11 57:3,13 58:14
   61:15 64:22 74:10
   75:17
**read-and-sign**
74:7
**reading**
14:22
**ready**
56:10 57:3 65:14
**really**
8:11 29:18
**Realtime**
1:21
**reason**
6:22,22 70:7,8 75:2
**recall**
18:11 26:15,21 41:13
   45:11 47:4,4 58:11
   62:20 63:4 70:5



MAGNA ▶
LEGAL SERVICES

71:25 72:7 73:12
**receive**
28:7 48:14,16
**received**
51:10 68:1
**recess**
45:1
**recognize**
60:8,10
**recollection**
28:22
**record**
5:19 10:18 14:25
43:15 52:4,15 76:4
**recording**
29:14
**records**
73:17
**reduce**
9:11,14
**reduced**
27:9 76:6
**refer**
52:20 54:9
**reference**
57:14,17,18 58:5
61:2,13 63:1 65:20
70:1
**referenced**
7:17 56:14 70:9
**references**
64:14 65:16
**referring**
7:13 54:21 57:23
58:17
**refuse**
68:12
**regarding**
70:24
**Registered**
1:20
**Registry**
32:11,15 33:2,8
**regularly**
66:19
**relate**

65:8
**related**
30:14
**relates**
7:23 20:3 57:19
**relationship**
36:9 37:11 40:5,10
42:2,14 45:24 50:17
53:14,16 57:19 58:7
63:14,16,17,25 64:1
66:12 67:12 68:8,11
**relationships**
45:15
**reload**
61:25
**remember**
73:19
**remind**
38:2
**reminder**
17:6
**Remote**
1:7,16
**remotely**
1:16
**repeat**
17:15 65:11
**rephrase**
15:11
**report**
9:20,23 10:6
**reported**
56:3
**reporter**
1:20,21 5:2,10 14:23
14:24 17:20 67:1
74:11,14
**representing**
69:17
**request**
47:21 73:13,19 74:9
76:13
**requested**
14:25 28:23 76:7
**requests**
58:8 72:17,25

**require**
28:4
**required**
29:3
**resolve**
6:2 49:7
**resolved**
50:14
**respect**
15:13 16:2 49:25
67:10
**respond**
18:20 28:18
**response**
5:20 6:14 28:24
35:20 36:16
**responsibilities**
7:23 13:10 14:4 47:9
**responsibility**
4:19
**responsible**
41:11,15
**responsive**
6:10
**result**
42:11 66:12,21 68:10
76:8
**results**
27:9
**resumed**
63:17
**retention**
22:13,14
**reveals**
6:14
**reverse**
53:7
**review**
76:7,8
**reviewed**
76:13
**right**
12:22 19:6,6 27:2
31:18 53:11 57:1
59:19 64:17 69:3
72:25 74:3

**risk**
30:20 66:5
**Rob**
40:14,15,16
**role**
8:24 9:24 10:11
42:18 47:14 55:17
55:24 56:2
**roles**
8:23
**Rosenberger**
55:14,15
**roughly**
8:17,20 38:24
**routed**
42:7
**rule**
17:11
**rules**
4:16 5:5 24:7 76:4,9
76:14
**run**
62:12

--- S ---

**S**
4:1
**sale**
59:19,20
**sales**
8:25 10:4 16:12 22:4
58:21 59:12,14,16
61:8
**Salt**
2:8
**Sam**
68:23
**saying**
15:6,10 44:6 55:2
68:6 72:20
**says**
17:11 54:21 58:12,25
60:20
**Schorer**
69:25
**Scott**



68:18
**scott.allen@clearli...**
68:19
**screamers**
57:24 58:2
**screeners**
58:1
**script**
8:8,10 23:1,14,17
**scripted**
29:20
**scripting**
29:3
**scroll**
64:12
**scrub**
68:3
**Sean**
60:17
**searches**
38:6
**seasonality**
34:24 35:7 37:18
**second**
19:25 34:1,5 61:20
  61:21
**seconds**
62:1
**Section**
76:3,9,13
**see**
15:11 32:9 33:1,5,7
  44:24 48:12,17
  54:15 56:7,11 57:14
  57:16,16 59:4,12,14
  60:22,23,24 61:14
  64:15 67:7,15
**seen**
6:1 7:17 40:21 47:25
  53:5
**sells**
42:22
**send**
7:12 11:2,3 14:8
  18:17,21 21:9,12,25
  24:3 26:5,9 27:19

42:10 54:4 58:8
  60:12,15 67:23 68:3
  73:15
**sending**
15:14 19:9 22:17
  23:7 31:16 33:22
  34:1,10,17,20 35:5
  35:10 38:16 42:11
  44:13 59:13 64:4
  65:19
**sends**
10:22,22,23,24 38:20
  48:13
**senior**
10:12,14
**sense**
5:12,21 6:6 7:1 17:14
**sent**
9:21 26:12 27:22
  38:13 39:10 48:10
  53:23,24 55:6 59:15
  62:15 64:2
**sentence**
58:23
**separate**
54:6 67:22
**series**
4:18 7:25 8:7 33:11
  42:1 52:2,17 65:7
**service**
37:9
**services**
71:3
**set**
20:19
**settle**
51:5,12
**settled**
48:19 51:4
**settlement**
50:23
**seven**
8:22 36:21 67:10
**Seventh**
2:12
**shake**

5:7
**share**
39:13
**shorthand**
7:18 76:6
**shortly**
66:16
**showing**
60:20
**side**
70:17
**sign**
12:6,18,19 60:24,24
  74:10
**sign-off**
14:8
**signature**
75:18 76:10
**signed**
8:2 19:7 31:4,9 68:1
**similar**
4:21
**similarly**
1:6 5:14 11:5
**single**
26:23
**situated**
1:6
**situations**
49:11
**six-digit**
48:3
**Skype**
37:8
**slight**
61:24
**slightly**
12:12,19,21 15:11
  36:14 63:23
**small**
23:1
**sold**
61:19 62:11
**sole**
22:8
**solutions**

1:9,10 2:11 10:4
  25:12,18 69:18
**sorry**
9:14,15 15:23 17:4
  19:20 43:6,14 46:12
**Sounds**
44:23
**South**
2:7
**space**
11:8 39:2
**speak**
5:16 14:2,3 43:3
**speaking**
16:4
**specific**
13:4,5 16:3,23 19:15
  23:6 28:22 37:2
  38:5 73:19
**specifically**
45:11 70:6 72:10
**specifications**
13:25
**specifies**
12:12 13:6
**speculating**
45:12
**spoke**
35:25
**spoken**
36:10
**stamp**
3:8,9,10,11,12,13,14
  3:15
**stamps**
52:18
**standard**
6:3 60:7
**standing**
41:14
**stands**
46:6
**start**
20:14 31:20 53:10
  56:25 57:22 61:16
  63:19 64:3



**started**
6:19 7:3
**starting**
64:16
**starts**
61:18
**state**
2:7 16:12,13,24
  17:25
**states**
1:1 14:15 15:22 16:1
  16:6,18,19 24:21
  76:15
**staying**
66:2
**step**
32:25
**stepped**
41:14
**steps**
29:19,22 31:12,14,19
**Stern**
43:13,17,19,25
**Stern's**
43:15
**stopped**
42:11
**strategies**
8:14 42:9
**Street**
2:3,7
**stretch**
44:19
**strike**
12:3 25:15,25 30:13
  43:7 46:23
**subcontract**
71:2
**subcontracted**
71:19
**submit**
11:14,14
**submitting**
9:19
**subordinate**
9:21

**subpublishers**
71:14
**Subscribed**
75:22
**subscription**
33:8
**Subsequent**
73:2
**subsequently**
72:17
**suggest**
44:18
**Suite**
2:4,8
**summit**
41:20 45:16,20
**superior**
9:21
**supplemental**
59:18
**supplying**
56:6,13
**supposed**
65:24
**sure**
7:24 14:23 17:20
  18:9,15 19:24 27:12
  29:2,18 30:25 35:18
  44:5 46:13 49:5,21
**sworn**
75:22 76:3
**system**
8:4 29:16 32:17

————————————
**T**
————————————
**take**
4:22 5:10 6:21,25
  29:19 31:10 35:1
  44:18 56:9 59:15
  60:25 62:2 66:11
  67:4 68:2 69:12,21
**taken**
4:12 29:23 45:1 76:5
**takes**
32:25
**talk**

22:24,24 31:2
**talking**
9:18 71:17
**target**
58:12,24 59:1
**targeting**
13:24
**TCPA**
30:19 42:1 43:2,8
  46:8,19 47:1 50:22
**team**
47:17,17 55:23 61:4
  61:8,8 73:9
**technology**
18:17
**Ted**
57:8
**telephone**
15:15 72:9 73:14
**tell**
6:22
**telling**
39:14
**telophony**
47:17 61:4
**ten**
49:20
**ten-minute**
44:19
**tendered**
25:14,20
**term**
10:17 19:13 57:24
  63:4,8
**terminate**
42:14 63:19
**terminated**
30:3,7,17,21 40:10
  42:2 62:23 63:9,12
  63:13,15,19
**terminating**
64:1
**termination**
62:19 63:2,5,6
**terms**
7:21 13:23 14:12,16

16:10 26:18 35:12
  36:25 37:14,17
  44:15 54:6 59:6,19
  71:18
**test**
27:1,9,13,15 31:17
  51:22
**testified**
4:5 18:10 31:25
  35:16 39:19 71:22
  72:2,23
**testify**
10:16 41:25
**testimony**
9:7 18:1,11 26:15
  51:9 67:17 76:4
**text**
37:21 38:13 76:6
**thank**
9:4 18:24 31:13
  40:24 56:20 57:14
  69:6,8 74:3
**thanks**
11:24 12:15 57:10
  61:9
**they'd**
51:12
**thing**
8:12
**things**
6:19 8:6
**think**
5:4 6:20 7:17 8:6
  14:1 18:10 32:20
  35:13 44:3 49:4
  51:1 52:5 54:10
  57:22 67:17 72:2
  74:6
**thinking**
5:8 54:23
**third**
34:5 37:3 50:1 71:20
**thought**
11:8 52:3
**thread**
40:23 53:2,5 57:2



60:8
**three**
23:19,21 29:2,20
    31:12,14 34:16,17
    34:21 35:3 39:5
    41:24 49:16,17
**tie**
48:16
**tied**
48:14
**time**
5:23,24 6:21 14:19
    18:8 19:13 24:16
    28:23 35:10 36:2
    38:24 56:1,4,9 62:3
    63:7,17 69:7,12
    76:6
**time-stamp**
27:20
**times**
10:17 34:25 35:1
    49:16,18
**title**
7:7 10:3,14
**today**
4:19,21 5:2 6:13,20
    25:16 33:22 34:21
    35:4 38:23 39:19
    53:6 62:12 69:7
    73:24
**Todd**
43:13,25
**Todd's**
44:7
**token**
27:19,20 28:12,16,23
    51:20
**tokens**
27:25
**tools**
11:1
**top**
25:13 34:16,21 35:3
    35:11,13 57:4 64:16
    65:9,15
**track**

53:23,25 54:11
**tracked**
53:25
**traditional**
5:25
**traffic**
7:13,13 8:1,13,15 9:2
    9:9 10:22,23 13:7
    21:17 24:4 42:11,19
    56:6,13,18 62:13
    63:7 68:13
**training**
32:2,8
**transcript**
74:12 76:8,8,12,13
**transcription**
75:17
**transfer**
11:4,9,11,17,19 12:6
    12:17,18 13:5,13,17
    14:11,17 15:3,9
    16:3,17,19,23 17:24
    18:3 19:1,8 20:4,9
    20:18 21:6,23 22:3
    22:16,18 23:4,10
    26:4 28:4,8 30:3
    31:15,20 32:3,7,22
    33:19 35:12,17,21
    36:17 38:16 39:11
    45:10,14 48:10 55:4
    58:7 59:7 65:24
    71:18 73:3
**transferred**
15:5 29:11 49:12
    66:3 72:17
**transferring**
23:6 65:21 66:1
**transfers**
12:1,12,24 13:8 21:7
    21:9,11,24 26:5,9,9
    26:12 32:10 33:13
    33:16,20 34:10
    35:10 38:20,22,25
    39:23 44:14 54:4
    56:19 61:6
**treat**

11:10
**treated**
48:6
**true**
23:25 67:13,14 76:4
    76:16
**Trusted**
27:19,25 28:5,7,16
    51:20
**truthfully**
4:20
**try**
4:20 5:10 15:15
    21:15
**trying**
8:11
**TURCO**
2:11
**TV**
6:1
**two**
6:8 19:24 20:22,25
    25:13 35:24 48:16
    63:24
**type**
13:6,7
**types**
13:25 14:10
**typical**
5:15 69:5
**typically**
11:12 13:23 14:11
    15:21 37:18,19
    39:13 47:20 53:25
    63:5,8 73:15
**typo**
57:25
———————
            **U**
———————
**ultimately**
49:1
**unclear**
9:15
**uncommon**
62:21 66:18
**under-**

38:3
**understand**
4:22 6:5,16 9:4,7,16
    11:23 12:22 17:13
    19:1 25:10,17 27:11
    29:17,21,22 32:19
    33:10 34:3 35:8,15
    35:18 53:13 57:18
    57:23 59:6 61:1
    72:19
**understanding**
12:16 22:21 23:24
    24:2 25:22 26:1,10
    26:13 30:14,16
    39:21 49:6,10 51:14
    53:19,21 54:17,20
    56:13,15 58:16 68:7
    70:13
**understands**
58:25
**understood**
11:7 13:9 26:10 27:8
    27:24 30:12,21
    31:12 38:21 39:4,18
    40:17 42:13 44:5
    49:4 51:25 54:2
    55:7,25 56:5,20
    58:6 63:9 65:4 68:6
**United**
1:1 24:21 76:15
**universe**
52:13
**unlawful**
47:7 48:20 49:7
    50:15 51:10
**unpause**
62:22 66:18
**use**
13:10 19:24 22:9,11
    25:16 37:16,20,21
    52:13,14 63:5,8,11
**username**
20:10
**uses**
19:19 23:14
**usually**



17:8
**UT**
2:8
**utilize**
12:1
**utilized**
21:3 26:11

**V**

**vague**
59:22
**valid**
50:25 51:11,16
**value**
22:13,14 59:19,20
**vast**
18:22
**vendors**
26:18
**verify**
26:25 27:2
**versus**
12:13 13:8 26:9 49:2
  55:6
**vertical**
38:19,22,25
**vet**
68:2
**vetting**
26:24 51:21
**viable**
59:3
**Vice**
2:2
**Videoconference**
1:7,16
**view**
11:5
**violation**
65:16 66:3,21
**violations**
30:20 42:1 66:13
  67:11 68:11 71:11
**visit**
27:17
**volume**

34:12 35:12 42:10
  44:15 68:1,2
**vs**
1:8

**W**

**Waived**
76:10
**Wallis**
2:11
**Walsh**
65:10
**want**
7:20 17:2 31:2 33:21
  35:18 44:5 52:3
  71:15 73:21 74:7
**wanted**
30:20 56:17
**warm**
11:4,8,11,17 12:1,6
  12:12,17,18,24 13:5
  13:7,13,17 14:10,16
  15:8 16:3,17,18,23
  17:24 18:3 19:1,8
  20:4,9,17 21:6,23
  22:2,16 23:10 26:4
  26:12 28:3,7 30:3
  31:15,20 32:3,7,21
  33:13,16,19 34:10
  35:11,17,20 36:16
  38:16,20,22 39:11
  39:23 44:13 45:10
  45:13 48:10 54:4
  55:4 56:19 58:7
  61:6
**wasn't**
8:24 42:4
**way**
30:15 32:18 36:14
  38:6 40:4 54:3
  69:16
**ways**
5:24
**we'll**
6:20 7:3 31:18 44:24
  52:7 53:7 62:12

74:7
**we're**
13:25 15:10 35:4
  56:21 65:12 67:3
  68:9 71:12 73:23
**we've**
10:16 59:14 68:8
**Web-based**
1:16
**website**
20:14 27:16
**weekly**
58:8
**went**
20:13
**weren't**
42:12
**witness**
15:1 17:2,15,23
  24:10 28:3 29:6
  30:1,10 32:14 33:5
  34:20 35:24 36:20
  44:22 45:19 47:12
  50:6,12,20 58:11
  59:12 60:2,14 61:24
  64:9 65:14 68:15
  69:8 76:2,4,7,11,18
**word**
60:23,25 63:6,11,12
  67:4
**work**
9:1 21:8 68:4 71:13
**worked**
40:13 42:7
**working**
8:21,23 12:23 16:22
  62:13 64:5
**works**
5:1 33:12 44:20 69:4
**wouldn't**
32:18
**writing**
9:11,14 27:10
**written**
37:14 40:22

**X**

**X**
76:7

**Y**

**yeah**
9:17 10:21 11:7
  12:14 13:2 17:23
  18:6 22:5,13 27:18
  32:24 40:3 42:3,21
  42:25 43:24 48:22
  51:6 53:11 57:16
  59:17 61:1 62:6
  64:16
**year**
20:5 30:22 34:25
  35:2 40:13 41:21
  42:6 67:20
**years**
8:11,17,19,20 9:1
  20:23,25 35:24
  36:21 39:1,5 40:9
  41:24
**Yep**
67:21 74:9
**yesterday**
61:19 62:11
**York**
2:13 43:24 44:1,2,4
  44:10

**Z**

**Zero**
61:18 62:11
**zip**
14:15 16:14,15
**Zoom**
37:10,16

**0**

**02043**
2:4

**1**

**1**
3:8 52:23



**1:17**
54:15
**10:51**
1:15
**100**
44:12
**10123**
2:13
**10318**
3:11 60:4
**11:46**
45:2
**11:51:07**
60:18
**11:58**
45:2
**11298**
3:12 61:11,23 62:7
**12**
9:1
**12:44**
74:16
**12:55**
44:24
**13214**
3:13 64:11 69:22
**13286**
3:14 65:4,13
**13594**
3:15 66:24,25
**1400**
2:8
**15**
62:1
**15th**
76:18
**19**
8:19

**2**

**2**
3:9 55:9 60:16 61:13
    62:9
**2020**
55:25 62:16
**2022**

66:15 67:6,19 70:20
**2023**
1:14 75:22 76:18
**212-246-0900**
2:13
**2400**
2:4
**28th**
70:19

**3**

**3**
3:10 56:22
**30(e)**
76:9,13
**30(f)(1)**
76:3
**33**
66:9,13 68:11
**350**
2:3
**36**
2:7
**39**
60:25

**4**

**4**
3:3,11 54:13 60:4
**4:22-cv-1466**
1:6
**400**
58:13,24
**400-**
59:1
**40th**
2:12
**450**
2:12

**5**

**5**
3:12 61:11
**52**
3:8
**55**

3:9
**56**
3:10

**6**

**6**
3:13 64:11 69:22,23
**60**
3:11
**600**
58:13,24
**600-dollar**
59:2
**61**
3:12
**617-738-7080**
2:5
**64**
3:13
**65**
3:14
**67**
3:15
**69**
3:4

**7**

**7**
3:14 65:4
**7/21/2020**
60:17
**7th**
54:14

**8**

**8**
1:14 3:15 67:3,6
**801-323-3354**
2:9
**84145**
2:8
**8713**
3:8 52:23
**8739**
3:9 55:10
**8820**

3:10 56:22

**9**

**951**
1:19 76:1,20

